STATE OF CONNECTICUT *v.* JANET GRIFFIN
(SC 15495)

Callahan, C. J., and Borden, Berdon, Norcott, Katz, Palmer and McDonald, Js.[*]

---

[*] The listing of justices reflects their seniority status on this court as of the date of argument.

Argued February 18—officially released December 21, 1999

*Pamela S. Nagy,* assistant public defender, for the appellant (defendant).

*Rita M. Shair,* assistant state's attorney, with whom were *Timothy J. Liston,* senior assistant state's attorney, and, on the brief, *John Redway,* state's attorney, for the appellee (state).

*Opinion*

CALLAHAN, C. J. The defendant appeals from the judgment of conviction, after a jury trial, of one count of capital felony in violation of General Statutes § 53a-54b (8) and of two counts of murder in violation of General Statutes § 53a-54a.[1] In her appeal, the defendant claims that: (1) the trial court improperly permitted the state to "death qualify"[2] potential jurors prior to the guilt phase of her trial, thereby denying her right, under the Connecticut constitution, to trial by an impartial jury; (2) the trial court improperly excused a venireperson; and (3) the trial court's instruction on proximate causation was flawed. We affirm the judgment.

The jury reasonably could have found the following facts. In 1990, the defendant, Janet Griffin, was employed as a housekeeper at the Pico Resort Hotel in Vermont. Gina Coccia, the executive housekeeper at the hotel, was the defendant's supervisor.

The two women became friendly, shared an apartment and subsequently became lovers. In June, 1992,

[1] General Statutes § 53a-54b provides in relevant part: "A person is guilty of a capital felony who is convicted of any of the following . . . (8) murder of two or more persons at the same time or in the course of a single transaction . . . ."

General Statutes § 53a-54a provides in relevant part: "(a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person . . . ."

[2] The term "death qualified" jury has been used to refer to a jury from which prospective jurors have been excluded for cause on the basis of their opposition to the death penalty. See *Lockhart* v. *McCree,* 476 U.S. 162, 167, 106 S. Ct. 1758, 90 L. Ed. 2d 137 (1986).

Coccia ended her intimate relationship with the defendant. When Coccia terminated the relationship, the defendant became very upset and told Coccia that she wanted it to continue. Around that same time, Coccia and her father purchased a two-family house in Vermont, and the defendant and Coccia moved into that house. There, the two women continued to share a bedroom, but they did not resume an intimate relationship.

Shortly thereafter, while visiting her aunt, Margaret Pugliese, in Bloomfield, Connecticut, Coccia met one of the victims, Patricia Lynn Steller. Steller resided at 14 Red Orange Road, Middletown. Coccia and Steller became friends, and Coccia subsequently returned to Connecticut several times to see Steller. Steller and Pugliese also visited Coccia in Vermont two or three times.

In January, 1993, Coccia requested that the defendant move out of their apartment by June, 1993. The defendant became very emotional, and she stated that she still loved Coccia and did not want to leave. Coccia reiterated that their romantic relationship was over and had been over for some period of time.

In April, 1993, Coccia began an intimate relationship with Steller. Although Steller traveled to Vermont to see Coccia on several occasions, she did not stay at the apartment that Coccia shared with the defendant. Instead, Steller stayed at Pugliese's nearby vacation home. Coccia, in turn, frequently visited Steller and stayed at Steller's residence at 14 Red Orange Road, Middletown. Coccia did not inform the defendant of the nature of her relationship with Steller.

In May, 1993, the defendant moved into an apartment owned by Natalie Jurgen. At that time, the defendant and Coccia both were employed by The Woods at Killington, another Vermont resort. Although they no longer

were roommates, the two women remained friendly and continued to drive to work together. The defendant, however, repeatedly told Jurgen that she still loved Coccia and that she wanted her back.

The summer of 1993, Coccia decided to leave Vermont and move to Connecticut to be with Steller. Coccia discussed her plans with the defendant, who became very upset. Visibly shaken, the defendant stated that she wanted to resume her relationship with Coccia. The defendant told Coccia that it was all or nothing—she did not want to speak to Coccia again if Coccia was not willing to resume their intimate relationship. Coccia replied that she was sorry, but if it was all or nothing, it would have to be nothing. The defendant subsequently called Coccia, however, and indicated that she wished them to remain friendly.

On August 13, 1993, Coccia left Vermont and moved into Steller's Middletown residence. The second victim, Ronald King, who was Steller's nephew, also lived at that address. Coccia took her dog, a small Pomeranian, with her when she moved to 14 Red Orange Road. Steller's house had a "dog door" in the kitchen, a hatch designed to allow the dog to enter and leave the house unassisted.

Coccia and the defendant remained friendly after Coccia moved to Middletown, and the two women exchanged telephone calls on a regular basis. The defendant, however, resented Steller. On August 23, 1993, she told a coworker that Steller was a "city slut dyke" and that Steller was more or less holding Coccia captive and ruining Coccia's life.

That fall, Coccia and Steller spent two or three weekends at Coccia's Vermont home. On those occasions, the defendant refused to visit Coccia because she did

not want to see Coccia with Steller. Instead, the defendant insisted that Coccia come alone to the defendant's apartment.

Coccia and Steller spent the first weekend in October, 1993, in Vermont. Before returning to Connecticut, Coccia informed the defendant that she would no longer visit the defendant alone at the defendant's apartment and that, if the defendant wished to see Coccia in the future, she would have to do so at Coccia's home when Steller was present. The defendant replied that she was unsure of what she was capable of doing under those circumstances.

The next afternoon, Monday, October 4, 1993, the defendant and her daughter, Melody Jasmin, unexpectedly arrived at 14 Red Orange Road, having driven to Middletown in a rented car. The defendant told Coccia that she had been shopping in the Middletown area and had decided to stop for a visit. The real purpose of the visit, however, was to see the inside of Steller's house. During the visit, while chatting in the kitchen, Coccia told the defendant a story about having been locked out of the house and having had to crawl into the house through the "dog door."

October 4, 1993, was not the only time the defendant visited Red Orange Road. The defendant and Jurgen had made four trips to Middletown between August, 1993, and November, 1993. The first trip took place at the end of August, when the defendant asked Jurgen to drive her to Connecticut so that she could see where Coccia and Steller lived. On that trip the defendant planned to use magic marker to write epithets on Steller's car. It was dark when the defendant and Jurgen arrived at Steller's house, and the defendant exited Jurgen's vehicle and approached the house. She returned to Jurgen's automobile, however, without having written on Steller's car.

A few weeks later, the defendant again asked Jurgen to drive her to Middletown. The defendant hoped to see where Steller, who was employed at Wesleyan University, worked. Upon arriving in Middletown, Jurgen drove to Wesleyan University. The defendant located Steller's car in a parking lot and photographed it. Jurgen then drove the defendant around the area adjacent to Red Orange Road. As they were driving through that neighborhood, the defendant asked Jurgen questions and took notes regarding routes in and out of the area.

After their second trip to Connecticut, the defendant informed Jurgen that she planned to kill Steller. Nevertheless, in early October, 1993, Jurgen drove the defendant to Middletown a third time. The two women again drove around Red Orange Road and a neighboring street, Brush Hill Road. The defendant told Jurgen that she was planning to kill Steller at a stop sign on Brush Hill Road because she wanted Coccia back. The defendant blamed Steller for the breakup of her relationship with Coccia and planned to douse her with ether, set her car afire and stab her.

Approximately one week later, Jurgen and the defendant traveled to Middletown a fourth time. On that trip, Jurgen parked her car several blocks from Steller's home and remained in the car while the defendant walked off in the direction of Steller's house. The defendant returned to Jurgen's car approximately fifteen minutes later, and the two women then drove down Brush Hill Road again before returning to Vermont.

After they had returned from their fourth trip to Connecticut, the defendant again told Jurgen that she planned to kill Steller on Brush Hill Road. She said that a coworker, Gordon "Butch" Fruean, Jr., had agreed to accompany her to Middletown to assist. Jurgen noticed that the defendant had a black cap, gloves and a gun

in her bag. The weapon in the defendant's bag, a thirty-two caliber handgun, had been given to Fruean by his father. The defendant told Jurgen she was going to use the gun to kill Steller and asked Jurgen to wish her luck.

The defendant and Fruean thereafter drove to Middletown intending to ambush Steller at an intersection on Brush Hill Road. Steller, however, did not pass through the intersection that night. Fruean became nervous, and he and the defendant returned to Vermont.

The defendant subsequently asked Jurgen to drive her to Middletown again so that she could kill Steller. Jurgen refused. The defendant then made arrangements to pick up a rental car on November 1, 1993.

Before departing for work on November 1, 1993, Steller had erased her telephone answering machine tape and reset the machine, which was located on the kitchen counter. Steller and King then left the Red Orange Road residence together and drove to work at Wesleyan University in Steller's car. Coccia, the last person to leave 14 Red Orange Road that morning, before leaving placed her dog in its cage and checked that the windows and exterior doors were locked.

That same day, November 1, 1993, the defendant picked up the rental car that she previously had reserved, and she and Fruean drove to 14 Red Orange Road. The defendant and Fruean entered the locked house by crawling through the "dog door."

Steller and King returned home from work around 3:30 p.m. and entered the house through the garage. When they went into the kitchen, the defendant and Fruean were already waiting.

The defendant shot and attacked both of the victims as they entered the kitchen. During the scuffle, the telephone answering machine located on the kitchen counter was activated and recorded some of the audible

portion of the events that were taking place in the kitchen.[3] The defendant shot Steller once and King three times. When the gun had been emptied, the defendant, realizing that the victims were still alive, asked Fruean for assistance. Fruean took a butcher's knife from a knife block located on the kitchen counter and handed it to the defendant, who proceeded to stab Steller and King several times. The defendant also used a serrated paring knife and a carving knife to stab the victims. Realizing that the victims, even then, still were alive, the defendant smashed a ceramic lamp on Steller's head and broke a glass mason jar over King's head. While striking King, the defendant cut her hand on the glass shards of the broken mason jar.

---

[3] When Coccia returned home from work that evening, she entered the house, discovered Steller and King dead on the kitchen floor, and ran to a neighbor's house to summon the police. Shortly thereafter, while one of the first Middletown police officers to arrive at the scene was standing over the bodies, the answering machine on the kitchen counter clicked on, stated that the tape was full and then shut off. The officer alerted the state police, who obtained a warrant and seized the tape. The seized answering machine tape reveals the following conversation:

The defendant: "I thought you were going to help me."

Steller: "No, please."

The defendant: "Butch, hold her."

Steller: "No, don't. Don't, no, don't, don't, come on please, I've got a son. Come on, Janet."

Fruean: "Do it."

Steller: "Janet. No!" (clicking noise)

The defendant: "Oh great. I can't."

Steller: "Ronnie, Ronnie, Ronnie, no, no, no, Janet no!" (sound of struggle)

Steller: "Ronnie, Ronnie, Ronnie, help me!" (sound of struggle)

Steller: "No! Ronnie, Ronnie, Ronnie, Ronnie, Ronnie, God, no, God please! No! No! No, Janet!"

King: (Loud groan)

Steller: "Oh god. Ronnie help me." (yells; groans)

The defendant: "Give me something, anything."

Fruean: "Here." (sound of breakage)

The defendant: "Butch, here, here, he's not done, he's not done; no, hand me something." (sound of breakage)

Fruean: "Let's go."

The defendant: "He's done, let's go."

The defendant and Fruean left the three bloodstained knives used in the attack at the scene, but took the gun with them. Blood from the defendant's wounded hand subsequently was found on King's clothing, on the wall leading to the front door, on the carpet, on the walkway leading away from Steller's home and in the rental car. Lisa Flagg, a woman visiting a friend in the neighborhood, observed the defendant and Fruean leaving Steller's home at approximately 3:55 p.m. Upon leaving, the defendant and Fruean drove to a nearby pond and threw Fruean's gun into the pond. Fruean's father later identified the gun recovered from the pond as being the gun he previously had given to his son.

When Coccia returned home from work at approximately 5:30 p.m., she found Steller and King dead on the kitchen floor. The stab wounds and the gunshot wound Steller suffered each was sufficient to have caused her death. King's death was caused by a combination of the stab and gunshot wounds.

The defendant was charged with two counts of murder and one count of capital felony. She entered a plea of not guilty and elected to be tried by a jury. On November 3, 1995, she filed a motion in limine seeking an order prohibiting counsel from asking potential venirepersons: (1) "[a]ny questions concerning attitudes and beliefs for or against the imposition of the death penalty"; and (2) "[a]ny questions by which it is directly or indirectly suggested that the defendant, if convicted of [c]apital felony, in violation of [§] 53a-54b (8) might suffer the penalty of death." The motion also sought to prohibit the excusal for cause, *prior to the guilt phase of the trial,* of prospective jurors who were unalterably opposed to capital punishment. That motion was denied.

Jury selection for the defendant's trial consumed some forty court days,[4] during which more than 150 venirepersons were voir dired. The trial court, over the defendant's objections, excused for cause twelve venirepersons on the ground that their opposition to the death penalty would prevent or substantially impair the performance of their duties as jurors during the sentencing phase of the trial. The trial court also excused for cause three venirepersons who stated that if the defendant was found guilty, the death penalty should be imposed automatically. In light of the capital felony charges, the court granted each party thirty peremptory challenges. Of those, the state used thirty and the defendant used twenty-seven.

The jury returned a verdict of guilty on all counts. Thereafter, the trial court conducted a separate sentencing hearing, pursuant to General Statutes (Rev. to 1993) § 53a-46a,[5] before the same jury. The jury returned

[4] Jury selection began on January 9, 1996, and was completed on March 13, 1996.

[5] General Statutes (Rev. to 1993) § 53a-46a provides in relevant part: "(a) A person shall be subjected to the penalty of death for a capital felony only if a hearing is held in accordance with the provisions of this section.

"(b) For the purpose of determining the sentence to be imposed when a defendant is convicted of . . . a capital felony, the judge . . . who presided at the trial . . . shall conduct a separate hearing to determine the existence of any mitigating factor concerning the defendant's character, background and history, or the nature and circumstances of the crime, including any mitigating factor set forth in subsection (g), and any aggravating factor set forth in subsection (h). . . . Such hearing shall be conducted (1) before the jury which determined the defendant's guilt, or (2) before a jury impaneled for the purpose of such hearing if . . . (c) the jury which determined the defendant's guilt has been discharged by the court for good cause . . . .

"(c) In such hearing . . . [t]he burden of establishing any of the factors set forth in subsection (h) shall be on the state. The burden of establishing any mitigating factor shall be on the defendant.

"(d) In determining whether a mitigating factor exists concerning the defendant's character, background or history, or the nature and circumstances of the crime, pursuant to subsection (b) of this section, the jury . . . shall first determine whether a particular factor concerning the defendant's character, background or history, or the nature and circumstances of the crime, has been established by the evidence, and shall determine further whether that factor is mitigating in nature, considering all the facts and

a special verdict finding that the state had proved aggravating factors beyond a reasonable doubt regarding both the murder of Steller and the murder of King, and that the defendant had proved mitigating factors by a preponderance of the evidence. The trial court merged the two murder counts with the capital felony count and rendered a judgment of conviction accordingly, and imposed a sentence of life imprisonment without the possibility of release pursuant to § 53a-46a (g). This appeal followed.[6]

circumstances of the case. Mitigating factors are such as do not constitute a defense or excuse for the capital felony of which the defendant has been convicted, but which, in fairness and mercy, may be considered as tending either to extenuate or reduce the degree of his culpability or blame for the offense or to otherwise constitute a basis for a sentence less than death.

"(e) The jury . . . shall return a special verdict setting forth its findings as to the existence of any aggravating or mitigating factor.

"(f) If the jury . . . finds that one or more of the factors set forth in subsection (h) exist and that no mitigating factor exists, the court shall sentence the defendant to death. If the jury . . . finds that none of the factors set forth in subsection (h) exists or that one or more mitigating factors exist, the court shall impose a sentence of life imprisonment without the possibility of release. . . .

"(h) If no mitigating factor is present, the court shall impose the sentence of death on the defendant if the jury . . . finds by a special verdict . . . that (1) the defendant committed the offense during the commission or attempted commission of, or during the immediate flight from the commission or attempted commission of, a felony and he had previously been convicted of the same felony; or (2) the defendant committed the offense after having been convicted of two or more state offenses or two or more federal offenses or of one or more state offenses and one or more federal offenses for each of which a penalty of more than one year imprisonment may be imposed, which offenses were committed on different occasions and which involved the infliction of serious bodily injury upon another person; or (3) the defendant committed the offense and in such commission knowingly created a grave risk of death to another person in addition to the victim of the offense; or (4) the defendant committed the offense in an especially heinous, cruel or depraved manner; or (5) the defendant procured the commission of the offense by payment, or promise of payment, of anything of pecuniary value; or (6) the defendant committed the offense as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value."

[6] General Statutes § 51-199 (b) provides in relevant part: "The following matters shall be taken directly to the Supreme Court . . . (3) an appeal in any criminal action involving a conviction for a capital felony . . . ."

I

The defendant claims that article first, §§ 8 and 19,[7] of the Connecticut constitution prohibits the identification and excusal for cause, prior to the *guilt phase* of a bifurcated capital felony trial, of venirepersons whose beliefs concerning the death penalty would prevent or substantially impair the performance of their duties as jurors during the *sentencing phase* of the trial. Specifically, the defendant maintains that questioning venirepersons, prior to the guilt phase of the trial, about their beliefs regarding the death penalty, and excusing for cause those venirepersons whose opposition to the death penalty would interfere with the performance of their duties as jurors at the sentencing phase of the trial, results in a guilt phase jury that is not impartial because it is: (1) more "conviction prone" than a jury that is not death qualified; and (2) not composed of

[7] Article first, § 8, of the constitution of Connecticut, as amended by articles seventeen and twenty-nine of the amendments, provides in relevant part: "a. In all criminal prosecutions, the accused shall have a right to be heard by himself and by counsel; to be informed of the nature and cause of the accusation; to be confronted by the witnesses against him; to have compulsory process to obtain witnesses in his behalf; to be released on bail upon sufficient security, except in capital offenses, where the proof is evident or the presumption great; and in all prosecutions by information, to a speedy, public trial by an impartial jury. No person shall be compelled to give evidence against himself, nor be deprived of life, liberty or property without due process of law, nor shall excessive bail be required nor excessive fines imposed. No person shall be held to answer for any crime, punishable by death or life imprisonment, unless upon probable cause shown at a hearing in accordance with procedures prescribed by law, except in the armed forces, or in the militia when in actual service in time of war or public danger. . . ."

Article first, § 19, of the constitution of Connecticut, as amended by article four of the amendments, provides: "The right of trial by jury shall remain inviolate, the number of such jurors, which shall not be less than six, to be established by law; but no person shall, for a capital offense, be tried by a jury of less than twelve jurors without his consent. In all civil and criminal actions tried by a jury, the parties shall have the right to challenge jurors peremptorily, the number of such challenges to be established by law. The right to question each juror individually by counsel shall be inviolate."

a representative cross section of the community. The defendant argues that such venirepersons properly may be identified and excused for cause only at the sentencing phase of a bifurcated capital felony trial. We disagree.

In *State* v. *Geisler*, 222 Conn. 672, 684–86, 610 A.2d 1225 (1992), we adopted an analytic framework for determining whether our state constitution affords Connecticut citizens greater individual liberties than does its federal counterpart. Specifically, we enumerated six factors to be considered: (1) persuasive relevant federal precedents; (2) the text of relevant constitutional provisions; (3) historical insights into the intent of our constitutional forebears; (4) related Connecticut precedents; (5) persuasive precedents of other state courts; and (6) contemporary understandings of applicable economic and sociological norms. Id.; see also *State* v. *Tuchman*, 242 Conn. 345, 360, 699 A.2d 952 (1997); *State* v. *McDougal*, 241 Conn. 502, 515–16, 699 A.2d 872 (1997); *State* v. *Webb*, 238 Conn. 389, 402, 680 A.2d 147 (1996). None of those factors supports the defendant's state constitutional claim.

A

Relevant Federal Precedent

The United States Supreme Court first addressed the issue of "death qualification" of jurors in capital cases in *Witherspoon* v. *Illinois*, 391 U.S. 510, 88 S. Ct. 1770, 20 L. Ed. 2d 776 (1968). In *Witherspoon*, a state statute permitted the excusal for cause of "any [venireperson] who shall, on being examined, state that he has conscientious scruples against capital punishment, or that he is opposed to the same." (Internal quotation marks omitted.) Id., 512. Thus, the statute at issue in *Witherspoon* not only permitted the excusal of venirepersons whose beliefs concerning the death penalty would prevent or substantially impair their ability to

perform their duties as jurors, it also allowed the excusal for cause of venirepersons who were opposed to the death penalty even if their scruples against the death penalty would not interfere with the performance of their duties as jurors.[8]

The petitioner in *Witherspoon* argued that excusal for cause, *prior to the guilt phase of the trial,* of all venirepersons with scruples against the death penalty results in a jury "necessarily . . . biased in favor of conviction," thereby violating a defendant's right under the sixth amendment to the United States constitution to have his innocence or guilt determined by an impartial jury. Id., 516. The court, however, concluded that the petitioner had not presented sufficient evidence to support a conclusion that the excusal, prior to the guilt phase, of venirepersons with scruples against the death penalty necessarily results in a more "conviction prone" jury. Id., 517–18. Consequently, the court rejected the petitioner's claim that the "death qualification" process utilized at his trial deprived defendants of their federal constitutional right to have their innocence or guilt determined by an impartial jury. Id.

The court also considered, however, the effect that the "death qualification" process utilized at the petitioner's trial had at the sentencing phase. *Witherspoon* was decided before the court's decisions in *Furman* v. *Georgia*, 408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972), and *Gregg* v. *Georgia*, 428 U.S. 153, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976), and the then current Illinois death penalty statute provided jurors "broad discretion to decide whether or not [to impose the death penalty] in a given case." *Witherspoon* v. *Illinois*, supra, 391 U.S. 519. Noting that under the Illinois statutory scheme, "a

---

[8] At the trial of the petitioner in *Witherspoon*, the state used the statute to excuse for cause forty-seven venirepersons, nearly one half of the entire venire panel, each of whom had expressed concerns about the death penalty. *Witherspoon* v. *Illinois*, supra, 391 U.S. 513–14.

juror's general views about capital punishment [played] an inevitable role in any such decision"; id.; the court concluded that the excusal for cause of all venirepersons with scruples against the death penalty resulted in a jury that at sentencing was "uncommonly willing to condemn a man to die." Id., 521. On that basis, the court held that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." Id., 522. The court stated, however, that this conclusion did not "render invalid the *conviction*, as opposed to the *sentence*, in [*Witherspoon*] or any other case." (Emphasis in original.) Id., 522–23 n.21.

The court also suggested in a footnote in *Witherspoon* that the federal constitution did not prohibit the excusal for cause of venirepersons "who [make] unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) [whose] attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt*." (Emphasis in original.) Id., 522–23 n.21. Thus, the court's decision in *Witherspoon* indicated that in capital criminal trials, two categories of venirepersons properly could be excused for cause on the basis of their opposition to the death penalty: (1) individuals whose beliefs would prevent them from performing their duties as jurors during the guilt phase of the trial; and (2) individuals whose beliefs automatically would prevent them from performing their duties as jurors during the sentencing phase of the trial.

In *Wainwright* v. *Witt*, 469 U.S. 412, 105 S. Ct. 844, 83 L. Ed. 2d 841 (1985), which was decided after *Furman* and *Gregg*, the United States Supreme Court again

considered the effect that a prospective juror's beliefs concerning the death penalty have on that individual's eligibility to serve as a juror in a capital case. In *Witt*, the court noted that its statement in *Witherspoon* that a venireperson could be excused for cause if his beliefs "automatically" would prevent him from imposing a sentence of death was best understood in the context of the death penalty statute at issue in that case. Id., 418. The court clarified the standard for determining whether a venireperson properly may be challenged for cause on the basis of his beliefs regarding the death penalty. Specifically, the court concluded that the federal constitution permits the excusal for cause of venirepersons whose opposition to capital punishment would prevent or substantially impair the performance of their duties as jurors in accordance with the court's instructions and the juror's oath. Id., 424. Thus, as interpreted in *Witherspoon* and *Witt*, the federal constitution permits the excusal for cause of venirepersons whose opposition to the death penalty would prevent or substantially impair the performance of their duties as jurors during either: (1) the guilt phase of the trial; *or* (2) the sentencing phase of the trial. For a venireperson's opposition to the death penalty to be considered as preventing or substantially impairing the performance of that individual's duties as a juror during the sentencing phase of the trial, so as to permit excusal for cause, the federal constitution does not require that the venireperson explicitly state that, upon conviction, he automatically would vote not to impose a sentence of death. Instead, the federal constitution permits the excusal for cause of venirepersons whose responses during voir dire raise serious doubt as to their ability to follow the law during the sentencing phase.

In 1986, the United States Supreme Court again addressed the issue of "death qualification" of venirepersons in *Lockhart* v. *McCree*, 476 U.S. 162, 106 S. Ct.

1758, 90 L. Ed. 2d 137 (1986). At the trial of the petitioner in *Lockhart,* the court had excused certain venirepersons for cause in accordance with the *Witt* test. Id., 166. On appeal, the petitioner did not claim that any of the jurors who had served at his trial had been "partial" in the sense that they had been unable to render a verdict based solely on the evidence and the trial court's instructions. Id., 167. Instead, relying on social science evidence, the petitioner contended that the excusal for cause, prior to the guilt phase, of venirepersons whose opposition to the death penalty would prevent them from performing their duties as jurors only at the sentencing phase of a capital criminal trial, results in a more "conviction prone" guilt phase jury, thereby depriving the defendant of his rights under the sixth amendment to have his guilt or innocence decided by: (1) a jury composed of a representative cross section of the community; and (2) an impartial jury. Id., 167–68. The United States Supreme Court disagreed, concluding that: (1) although the sixth amendment requires that juries be fairly selected from a venire pool comprising a representative cross section of the community, it does not require that the actual jury so selected be composed of a representative cross section of the community; id., 173–77; (2) the petitioner had not presented social science evidence establishing the hypothesis that "death qualification" of venirepersons prior to the guilt phase of a bifurcated trial results in juries that are more "conviction prone"; id., 168–73; (3) the sixth amendment right to trial by an "impartial" jury requires only a trial by "jurors who will conscientiously apply the law and find the facts"; id., 178; and (4) consequently, even if the social science evidence had been capable of supporting a finding that the excusal for cause, prior to the guilt phase of the trial, of venirepersons whose beliefs preclude them from serving as jurors only during the sentencing phase of the trial results in juries that

are more "conviction prone," such a finding would not have been a ground for concluding that death qualified juries are not "impartial" within the meaning of the sixth amendment. Id., 174. Thus, the court concluded that the federal constitution did not prohibit the excusal for cause, prior to the guilt phase, of venirepersons whose opposition to the death penalty would preclude them from serving as jurors at the sentencing phase of a capital trial.

In 1992, the United States Supreme Court examined once again the issue of "death qualification" of venirepersons in bifurcated capital felony trials. *Morgan* v. *Illinois*, 504 U.S. 719, 112 S. Ct. 2222, 119 L. Ed. 2d 492 (1992). At the trial of the petitioner in *Morgan*, the court had permitted the state, prior to the guilt phase of the trial, to ask potential jurors whether their opposition to the death penalty would prevent them from performing their duties as jurors. Id., 722. The trial court, however, had refused the petitioner's request to ask potential jurors whether, if the petitioner was convicted, they automatically would vote to impose the death penalty regardless of the facts. Id., 723. The United States Supreme Court concluded that the federal constitution guarantees defendants in capital cases the right to question and excuse for cause any venireperson who, upon conviction, would *automatically* vote to apply the death penalty regardless of the facts. Id., 735–36.

To summarize, it is well settled that the federal constitution permits the identification and excusal for cause, prior to the guilt phase of a bifurcated capital felony trial, of venirepersons whose beliefs would preclude then from either: (1) serving as a juror during the guilt phase of the trial; *or* (2) serving as a juror during the sentencing phase of the trial. *Wainwright* v. *Witt*, supra, 469 U.S. 424. Excusal, *prior to the guilt phase*, of venirepersons whose beliefs concerning the death penalty would prevent or substantially impair the performance

of their duties at the sentencing phase, but not at the guilt phase, of the trial does not violate a defendant's rights under the sixth amendment to have his guilt or innocence decided by: (1) an impartial jury that (2) has been selected fairly from a venire pool composed of a representative cross section of the community. *Lockhart* v. *McCree*, supra, 476 U.S. 184. The federal constitution, moreover, not only permits questioning of venirepersons regarding their attitudes on the death penalty prior to the guilt phase of the trial, it also provides defendants a constitutional right to ask such questions. *Morgan* v. *Illinois*, supra, 504 U.S. 735–36.

It is useful at this juncture to identify what the defendant's state constitutional claim does not involve. The defendant does not argue that she was deprived of a trial by an impartial jury because the individuals who served as jurors at her trial were not "impartial" in the sense that they were incapable of finding facts solely on the basis of the evidence presented and applying the law in accordance with the court's instructions. Nor does she contend that the venire panels from which the jury that served at her trial was selected did not consist of a representative cross section of the community. Instead, the defendant asks us to conclude that, as a matter of law, the identification[9] and excusal for cause, prior to the guilt phase of a bifurcated capital felony trial, of venirepersons whose views about the death penalty would substantially impair their ability to serve as jurors at the sentencing phase results in a jury that is not "impartial" because: (1) it is more "conviction prone"; and (2) it is not composed of a fair cross section of the community. In effect, the defendant

---

[9] Paradoxically, the defendant acknowledges that the state constitution permits the excusal for cause, prior to the guilt phase of the trial, of venirepersons whose views about the death penalty would prevent or substantially impair the performance of their duties as jurors during the guilt phase of the trial. It is difficult to square this acknowledgment with the defendant's claims.

maintains that the state constitution requires that "pro-prosecution" and "prodefense" attitudes be balanced across the jury that is selected to decide a defendant's innocence or guilt. Thus, the defendant contends that our state constitution incorporates a meaning of "impartial jury" that the United States Supreme Court refused to adopt under the federal constitution in *Lockhart*. Federal precedent, therefore, does not support the defendant's state constitutional claim; indeed, it is directly contrary to that claim.

B

The Text of Relevant Connecticut
Constitutional Provisions

We turn our attention now to the second of the six *Geisler* factors—the language of the operative state constitutional provisions. Article first, § 19, of the constitution of Connecticut, as amended by article four of the amendments, provides in relevant part: "The right of trial by jury shall remain inviolate . . . ." Article first, § 8, of the constitution of Connecticut, as amended by articles seventeen and twenty-nine of the amendments, further provides in relevant part: "In all criminal prosecutions, the accused shall have a right . . . to a speedy, public trial by an impartial jury. . . ." Thus, the language of article first, § 8, is substantially the same as that of the sixth amendment to the United States constitution, which provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . . ." We can discern nothing in the language of article first, § 8, to suggest that the meaning of the term "impartial jury" in our state constitution is different from the meaning of that same term in the federal constitution— namely, a jury that is: (1) composed of individuals able to decide the case solely on the evidence and apply the law in accordance with the court's instructions; and

(2) properly selected from venire panels comprising a representative cross section of the community.

## C

### Historical Insights into the Intention of Our Constitutional Forebears

We turn our attention now to the third *Geisler* factor, historical insights into the intention of our constitutional forebears. In *State* v. *Gannon*, 75 Conn. 206, 226–33, 52 A. 727 (1902), this court traced the development of the state constitutional right to trial by an impartial jury: "[A] careful study of our colonial history . . . demonstrates . . . that when our Declaration of Rights was framed in 1818, the 'right of trial by jury,' with its *well known essential features as then established by our common law*, was one of those 'liberties and rights' recognized and established and declared to be forever after 'inviolate.' " (Emphasis added.) Id., 231–32. This court noted in *Gannon*, moreover, that it was a "settled doctrine of the common law" that cases "shall be tried by a jury . . . who shall find the matter of fact . . . *according to [the] law and [the] evidence* . . . ." (Emphasis added; internal quotation marks omitted.) Id., 228.

Chief Justice Zephaniah Swift, writing in 1822, described the right to trial by an impartial jury that was incorporated by the state constitution in 1818: "It is a rule of the common law, that all questions of fact must be tried by the jury . . . . When an issue in fact, is to be tried, and the parties do not agree to put it to the judges, it must, of course be tried by a jury . . . . The mode of selecting, and returning jurors, is prescribed by statute. The civil authority . . . in each town are to select from the freeholders, the number prescribed by law, whose names are returned to the town clerk, and put in the box. From these, the clerk . . . may cause fifteen to be summoned to attend the court, twelve of

which, shall be designated by lot; and a deficiency may be supplied by any freeholder from the county, who is in such case denominated a talisman. An excellent mode to guard against what are sometimes called *packed juries*.

"When the jurors are returned, and before they are sworn, the parties have a right to make their challenges. These are to the array, and to the polls. Challenges to the array, are an exception to the whole panel . . . . In England . . . where the sheriff has a discretionary selection of jurors among the freeholders of the county, it is reasonable that the array should be set aside where the returning officer is interested, or is guilty of any partiality, or misconduct. But in this state, as the . . . returning officers, can never exercise any discretion, but are to draw the number of jurors to be summoned, from the boxes in their respective towns, it is difficult to imagine any ground of challenge to the array for the partiality and misconduct of the returning officer. . . .

"Challenges to the polls, or to particular jurors, are 1, the want of qualifications, 2 for crimes, and 3 for partiality. . . .

"3. A juror may be challenged for suspicion of bias, or partiality, which may be either a principal challenge, or a challenge to the favour. A principal challenge is, when the cause assigned, carries evident marks of suspicion, either of malice, or favour. Thus when the juror is related to either of the parties, has been an arbitrator on either side, has an interest in the case . . . where he has been bribed, or has been a juror in the same cause, or is the party's master, servant, steward, attorney, landlord, or tenant, or has published his opinion upon the particular case, or has conversed with the parties . . . upon the subject in dispute, or has formed an opinion upon the merits of the case: these are principal causes of challenge, and if proved, cannot be overruled, but the juror must be excused. . . .

"Challenges to the favour, are founded merely on probable circumstances of suspicion, as particular friendship or enmity to either of the parties: and where the court has reason to think that there is such a bias or prejudice on the mind of a juror, as renders it probable that there will not be a candid and fair trial, they have discretionary power to dismiss him: but they ought not to indulge any unreasonable and groundless suspicion of the party. . . . If a sufficient number of jurors are not returned, or so many are challenged that enough are not left to complete the pannel, the court [shall] direct the sheriff to return a sufficient number of the freeholders of the county . . . who are called talismen." (Emphasis in original.) 1 Z. Swift, A Digest of the Laws of the State of Connecticut (1822) pp. 737–38.

Chief Justice Swift's writings make evident that the state constitutional guarantee of trial by an impartial jury incorporates two common-law rights derived from English law: (1) the right to trial by a jury that is properly selected from a venire panel composed of a representative cross section of the community, which right is secured by "challenges to the array"; and (2) the right to trial by a jury composed of individuals capable of deciding the case solely on the basis of the evidence and in accordance with the law, which right is secured by "challenges to the polls," i.e., in modern terminology, challenges for cause. "The purpose and effect of [article first, §§ 8 and 19] is to preserve . . . as a political right 'the institution of jury trial, *in all its essential features as derived from our ancestors and [existent] by force of our common law.' State* v. *Gannon*, [supra, 75 Conn. 232]." (Emphasis added.) *State* v. *Perrella*, 144 Conn. 228, 231, 129 A.2d 226 (1957). The defendant has not cited, and we are not aware of, any historical source that indicates that the common-law right to trial by an impartial jury that was incorporated into our state constitution in 1818 provides criminal defendants not

only with the rights to bring challenges to the array and to challenge individual venirepersons for cause because they are not capable of deciding the case solely on the basis of the evidence and in accordance with the law, but also the right to challenge the composition of a selected jury on the ground that "proprosecution" and "prodefense" attitudes are not balanced across the jury. Thus, historical insights into the intentions of our constitutional forebears do not support the defendant's state constitutional claim.

D

Relevant Connecticut Precedent

We turn now to the next *Geisler* factor, relevant Connecticut precedent. We repeatedly have equated the common-law right to trial by an impartial jury that was incorporated into the state constitution in 1818 to that provided by the federal constitution: " 'Jury impartiality is a core requirement of the right to trial by jury guaranteed by the constitution of Connecticut, article first, § 8, and by the sixth amendment to the United States constitution. . . . [T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, indifferent jurors. . . . The modern jury is regarded as an institution in our justice system that determines the case *solely on the basis of the evidence and arguments given [it] in the adversary arena after proper instructions on the law by the court.*' " (Emphasis added.) *State* v. *Santiago*, 245 Conn. 301, 330, 715 A.2d 1 (1998); *State* v. *Myers*, 242 Conn. 125, 140, 698 A.2d 823 (1997); *State* v. *Brown*, 235 Conn. 502, 522–23, 668 A.2d 1288 (1995); see also *State* v. *Cruz*, 212 Conn. 351, 562 A.2d 1071 (1989). "[Article first, § 8, and the sixth amendment require] that a criminal defendant be given a fair trial before an . . . unprejudiced jury . . . ." (Internal quotation marks omitted.) *State* v. *Woodson*, 227 Conn. 1, 30, 629 A.2d 386 (1993); *State* v. *Hernandez*, 218 Conn.

458, 463, 590 A.2d 112 (1991); accord *State* v. *Esposito*, 223 Conn. 299, 308, 613 A.2d 242 (1992); *State* v. *Brigandi*, 186 Conn. 521, 542–43, 442 A.2d 927 (1982).

With respect to the ability of individual venirepersons to serve as jurors, we have stated: "All agree in the value of trial by jury in criminal cases, especially in cases where life is at stake; and all will agree that [the] jury should be indifferent and impartial; that they should be [individuals] whose minds are open to impressions which the facts and law in the case ought to make, so that there should be no combat with preconceived opinions in regard to the case." *State* v. *Potter*, 18 Conn. 165, 171 (1846). "[I]f a potential juror has such fixed and settled opinion of the case that he cannot judge impartially the guilt of the defendant, he should not be selected to sit on the [jury] panel." *State* v. *Tucker*, 226 Conn. 618, 630, 629 A.2d 1067 (1993); *State* v. *Ziel*, 197 Conn. 60, 66, 495 A.2d 1050 (1985). "Where [however] a juror has a . . . mere impression, arising from facts supposed to exist, of the truth of which he has formed no opinion . . . there can be no ground to infer hostility or prejudice, and so the juror must be considered indifferent. *To exclude persons on such grounds would be to adopt a rule not known to the common law . . . .*" (Emphasis added.) *State* v. *Potter*, supra, 174–75. "It is enough if a juror is able to set aside any preconceived notions and decide the case on the evidence presented and the instructions given by the court." *State* v. *Cubano*, 203 Conn. 81, 92, 523 A.2d 495 (1987). Thus, we previously have recognized that the state constitutional right to trial by an impartial jury provides criminal defendants the common-law right to bring a "challenge to the polls," i.e., to challenge prospective jurors for cause and to have excused from service those venirepersons who are unable to set aside preconceived notions and decide the case solely on the evidence and in accordance with the court's instructions on the law.

Regarding the composition of a venire panel, we have stated that article first, § 8, encompasses "[t]he American tradition of trial by jury . . . [which] necessarily contemplates an impartial jury *drawn from a cross-section of the community. . . .* This fair cross section requirement mandates that the jury wheels, pools of names, the panels and venires *from which juries are drawn* must not systematically exclude distinctive groups in the community." (Citations omitted; emphasis added; internal quotation marks omitted.) *State* v. *Robinson,* 227 Conn. 711, 717, 631 A.2d 288 (1993); see *State* v. *McDougal,* supra, 241 Conn. 516–17 (distinguishing representative venire panel from representative jury).[10]

---

[10] We recognize that the equal protection clauses of the federal and state constitutions provide a defendant with additional bases for challenging the composition of the jury selected to determine the defendant's innocence or guilt. "In *Batson* v. *Kentucky,* [476 U.S. 79, 96, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986)], the United States Supreme Court held that the use of peremptory challenges to exclude 'a cognizable racial group' from a jury violated the equal protection clause of the United States constitution. That court later explained that this protection concerned the removal of 'cognizable groups' by peremptory challenge, but not other groups subject to rational basis review. *J.E.B.* v. *Alabama ex rel. T.B.,* 511 U.S. 127, 143, 114 S. Ct. 1419, 128 L. Ed. 2d 89 (1994). In extending the 'cognizable group' label to gender-based discrimination, the court stated: 'All persons, when granted the opportunity to serve on a jury, have the right not to be excluded summarily *because of discriminatory and stereotypical presumptions that reflect and reinforce patterns of historical discrimination.*' Id., 142–43." (Emphasis added.) *State* v. *McDougal,* supra, 241 Conn. 514. "In balancing the important right of peremptory challenges against the right to have a jury selected in a nondiscriminatory fashion, the United States Supreme Court has determined that the right of peremptory challenges gives way only when challenges are exercised to exclude a cognizable group from a petit jury. *J.E.B.* v. *Alabama ex rel. T.B.,* supra, [143]; *Batson* v. *Kentucky,* supra, [90–93]; *Swain* v. *Alabama,* 380 U.S. 202, 214–24, 85 S. Ct. 824, 13 L. Ed. 2d 759 (1965). Given the unique role of peremptory challenges in this state, we cannot say that the balance should be struck differently under our constitution." *State* v. *McDougal,* supra, 520. Individuals whose views about the death penalty preclude them from service as jurors at the sentencing phase, but not at the guilt phase, of a capital trial, however, do not constitute a "cognizable group" for equal protection purposes. Thus, the death qualification process utilized at the defendant's trial does not implicate the defendant's equal protection rights.

Thus, we have recognized that the state constitutional right to trial by an impartial jury incorporates the common-law right to bring "[c]hallenges to the array"; 1 Z. Swift, supra, p. 737; from which a jury is selected.

Moreover, the common-law challenges to the polls and to the array incorporated by the state constitution in 1818 no longer provide the only constitutional bases for challenging the impartiality of a jury. In 1972, article first, § 19, of the constitution of Connecticut was amended to provide in relevant part: "The right of trial by jury shall remain inviolate . . . . In all civil and criminal actions tried by a jury, the parties shall have the right to challenge jurors peremptorily . . . . The right to question each juror individually by counsel shall be inviolate." "[T]he enactment of article first, § 19, of the Connecticut constitution, as amended, reflects the abiding belief of our citizenry that an impartial and fairly chosen jury is the cornerstone of our criminal justice system." (Internal quotation marks omitted.) *State* v. *Tucker*, supra, 226 Conn. 630; see *State* v. *Day*, 233 Conn. 813, 845, 661 A.2d 539 (1995); *State* v. *Hancich*, 200 Conn. 615, 625, 513 A.2d 638 (1986). "One of the principal purposes of individual voir dire [guaranteed by article first, § 19] is the discovery of factors *'that may predispose a prospective juror to decide a case on legally irrelevant grounds'*; *Rozbicki* v. *Huybrechts*, 218 Conn. 386, 391, 589 A.2d 363 (1991); and thus provide a basis for a challenge for cause or for a peremptory challenge." (Emphasis added.) *Phillips* v. *Warden*, 220 Conn. 112, 146, 595 A.2d 1356 (1991); see *State* v. *Fritz*, 204 Conn. 156, 161, 527 A.2d 1157 (1987); *State* v. *Dolphin*, 203 Conn. 506, 511, 525 A.2d 509 (1987); *Lamb* v. *Burns*, 202 Conn. 158, 162, 520 A.2d 190 (1987); *State* v. *Hill*, 196 Conn. 667, 671–72, 495 A.2d 699 (1985). "[I]f there is any likelihood that some prejudice is in the juror's mind which will even subconsciously affect his [or her] decision of the case, the party who may be

adversely affected should be permitted questions designed to uncover that prejudice." (Internal quotation marks omitted.) *State* v. *Hodge*, 248 Conn. 207, 217, 726 A.2d 531 (1999); *State* v. *Rogers*, 197 Conn. 314, 318, 497 A.2d 387 (1985); *State* v. *Higgs*, 143 Conn. 138, 142, 120 A.2d 152 (1956). "This is particularly true with reference to the defendant in a criminal case. Otherwise, the right of trial by an impartial jury guaranteed to him by article first, § [8], of the constitution of this state might well be impaired." *State* v. *Higgs*, supra, 142; see also *State* v. *Wilson*, 38 Conn. 126, 137 (1871); *State* v. *Potter*, supra, 18 Conn. 171.

"After the completion of the voir dire of a particular venireperson, a party may challenge the venireperson for cause. The court must excuse that juror if the judge . . . is of the opinion from the examination that [the] juror would be unable to render a fair and impartial verdict . . . . Unless one of the parties exercises a peremptory challenge to remove the venireperson, a venireperson who has not been excused for cause must be accepted by the parties as a prospective member of the jury panel. . . . The purpose of voir dire is to facilitate [the] intelligent exercise of peremptory challenges and to help uncover factors that would dictate disqualification for cause. . . . *State* v. *Robinson*, supra, [227 Conn.] 247–48." (Internal quotation marks omitted.) *State* v. *Hodge*, supra, 248 Conn. 217. Thus, the state constitutional guarantee, provided in article first, § 8, of trial by an impartial jury is effectuated not only by correlative rights to challenge a jury array and to challenge prospective jurors for cause, it is also effectuated by the rights, provided in article first, § 19, to individual voir dire and to challenge prospective jurors peremptorily.

We reiterate that to support her state constitutional claim, the defendant does not claim that any of the jurors at her trial was partial in the sense that he or

she was unable to decide the case solely on the basis of the law and in accordance with the court's instruction. Nor does she claim that the trial court improperly refused to excuse, for cause or on the basis of a peremptory challenge, any of the jurors who served at her trial. The defendant also does not claim that the venire panels from which the jury that decided her case was selected were not made up of a representative cross section of the community. Instead, the defendant claims that it was the excusal of certain venirepersons, specifically individuals whose opposition to the death penalty precluded them from serving as jurors at the sentencing phase of the trial, but not at the guilt phase, that deprived her of trial by an impartial jury—a claim that we considered and rejected in *State* v. *Webb*, supra, 238 Conn. 468. Connecticut precedent, therefore, also does not support the defendant's state constitutional claim.

E

Decisions of Courts of Other States

We turn our attention now to the next *Geisler* factor, relevant decisions of the courts of other states. The defendant has not cited, and we are unaware of, any case in which another state has adopted the defendant's conception of "impartial jury" as a matter of state constitutional law. In fact, the common-law and federal standard of impartiality appears to have been followed for purposes of state constitutional law in all states that have addressed the issue of "death qualification" of a capital jury prior to the guilt phase of a capital trial. See, e.g., *People* v. *Mattson*, 50 Cal. 3d 826, 844, 789 P.2d 983, 268 Cal. Rptr. 802, cert. denied, 498 U.S. 1017, 111 S. Ct. 591, 112 L. Ed. 2d 595 (1990); *People* v. *Davis*, 794 P.2d 159, 204 (Colo. 1990), cert. denied, 498 U.S. 1018, 111 S. Ct. 662, 112 L. Ed. 2d 656 (1991); *Blount* v. *State*, 511 A.2d 1030, 1036–37 (Del. 1986); *State* v. *Burchett*, 224 Neb. 444, 450–52, 399 N.W.2d 258 (1986);

*State* v. *Ramseur*, 106 N.J. 123, 248–54, 524 A.2d 188 (1987); *State* v. *Barts*, 316 N.C. 666, 676–78, 343 S.E.2d 828 (1986); *State* v. *Duvigneaud*, 99 Or. App. 279, 281, 781 P.2d 1241 (1989); *Commonwealth* v. *Jermyn*, 516 Pa. 460, 488–89, 533 A.2d 74 (1987); *State* v. *McDowell*, 391 N.W.2d 661, 664–65 (S.D. 1986); *Marquez* v. *State*, 725 S.W.2d 217, 241–42 (Tex. Crim. App.), cert. denied, 484 U.S. 872, 108 S. Ct. 201, 98 L. Ed. 2d 152 (1987); *State* v. *Young*, 853 P.2d 327, 342 (Utah 1993); *Spencer* v. *Commonwealth*, 238 Va. 295, 308, 384 S.E.2d 775 (1989); *State* v. *Hughes*, 106 Wash. 2d 176, 721 P.2d 902, 908 (1986). Decisions of the courts of other states, therefore, do not support the defendant's state constitutional claim.

### F

### Economic and Sociological Factors

We consider now the last *Geisler* factor, economic and sociological norms. The defendant's state constitutional claim is based on the proposition that, as a matter of fact, identifying and excusing for cause, prior to the guilt phase, venirepersons whose beliefs would substantially impair their ability to serve as jurors at the sentencing phase, but not the guilt phase of the trial, results in a jury that is more "conviction prone." We reject that hypothesis.

The defendant presented no evidence at trial to support her contention that identification and excusal for cause, prior to the guilt phase, of venirepersons whose beliefs concerning the death penalty preclude them from serving as jurors during the sentencing phase of a capital felony trial results in a more "conviction prone" jury. Moreover, the defendant explicitly declined the trial court's invitation to provide such evidence. Instead, the defendant now relies entirely upon findings made by two federal district courts on the basis of certain social science evidence that "death qualified juries" are

"conviction prone." See *Keeten* v. *Garrison*, 578 F. Sup. 1164 (W.D.N.C.), rev'd, 742 F.2d 129 (4th Cir. 1984), cert. denied, 476 U.S. 1145, 106 S. Ct. 2258, 90 L. Ed. 2d 702 (1986); *Grigsby* v. *Mabry*, 569 F. Sup. 1273 (E.D. Ark. 1983), aff'd, 758 F.2d 226 (8th Cir. 1985), rev'd sub nom. *Lockhart* v. *McCree*, supra, 476 U.S. 162. In effect, the defendant asks us to take judicial notice of those findings.

"[A]n appellate court may take judicial notice of the existence of a body of scientific literature. . . . To ensure consistency in the approach to scientific evidence, a court should examine the foundation evidence received, if any; the scientific literature; and other courts' analyses. . . . Indeed, even when . . . there has been no evidence introduced at the trial level, an appellate court may properly analy[ze] . . . the issues . . . based [only] on consideration of the information gleaned from prior reported cases and published literature on the subject matter." (Citations omitted; internal quotation marks omitted.) *State* v. *Porter*, 241 Conn. 57, 94–95, 698 A.2d 739 (1997), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998).

" 'Judicial notice . . . meets the objective of establishing facts to which the offer of evidence would normally be directed.' " *Drabik* v. *East Lyme*, 234 Conn. 390, 398, 662 A.2d 118 (1995); *State* v. *Tomanelli*, 153 Conn. 365, 368, 216 A.2d 625 (1966). "The true concept of what is judicially known [therefore] is that it is something which is already in the court's possession or, at any rate, is so accessible that it is unnecessary and therefore time wasting to require evidence of it." *State* v. *Tomanelli*, supra, 368; *State* v. *Main*, 69 Conn. 123, 136, 37 A. 80 (1897). "[F]acts may be judicially noticed which are so notorious that the production of evidence would be unnecessary, or which the judicial function supposes the judge to be familiar with, in theory at least, or which, although they are neither notorious

nor bound to be judicially known, are capable of *such instant and unquestionable demonstration*, if desired, that no party would think of imposing a falsity on the tribunal in the face of an intelligent adversary." (Emphasis added; internal quotation marks omitted.) *State* v. *Tomanelli*, supra, 369. Thus, judicial notice properly may be taken of the courts' findings in *Keeten* and *Grigsby* that "death qualified" juries are more "conviction prone" only if those findings reasonably can be said to be not in dispute.

We begin our analysis by noting that in *Lockhart*, the United States Supreme Court thoroughly reviewed the social science evidence on which the district courts in *Keeten* and *Grigsby* had based their conclusions that "death qualified" juries are more "conviction prone," and the court concluded that the evidence presented was not capable of sustaining the district courts' findings. In light of that conclusion, the district courts' findings that "death qualified" juries are more "conviction prone" can reasonably be said to be in dispute. Consequently, those findings are not the proper subject of judicial notice.

Furthermore, our own thorough examination of: (1) the social science evidence presented in *Grigsby* and *Keeten* (social science evidence); (2) the reasoning of the District Courts and the Circuit Courts of Appeal in those cases; and (3) the United States Supreme Court's analysis in *Lockhart* of the social science evidence also persuades us that the social science evidence presented in those cases is not capable of establishing the defendant's hypothesis. That hypothesis, to reiterate, is that in Connecticut in 1999, the removal for cause, prior to the guilt phase of a capital felony trial, of venirepersons whose beliefs concerning the death penalty would prevent or substantially impair the performance of their duties as jurors during the sentencing phase of a capital felony trial results in a more "conviction prone" jury.

The social science evidence on which the defendant now relies consists of fourteen studies. Five of the studies[11] did not even identify the participants whose beliefs concerning the death penalty would supposedly preclude them from serving as jurors at the sentencing phase, but not at the guilt phase, of a capital trial. Thus, those five studies are incapable of establishing the defendant's hypothesis that identification and excusal of venirepersons at issue in the present case—individuals whose beliefs concerning the death penalty preclude them from serving as jurors at the sentencing phase, but not at the guilt phase, of the trial—results in a more "conviction prone" jury. Accord *Lockhart* v. *McCree*, supra, 476 U.S. 170–72.

Furthermore, eight of the nine remaining studies[12] only attempted to establish a correlation between views

[11] H. Zeisel, "Some Data on Juror Attitudes Toward Capital Punishment," University of Chicago Law School: Center for Studies in Criminal Justice (1988) (data collected in 1954 and 1955); W. Wilson, "Belief in Capital Punishment and Jury Performance," University of Texas (1964) (unpublished) (data collected from 187 college students in 1964); F. Goldberg, "Toward Expansion of *Witherspoon*: Capital Scruples, Jury Bias, and Use of Psychological Data to Raise Presumptions in the Law," 5 Harv. C.R.-C.L. L. Rev. 53 (1970) (data collected from college students in 1966 and 1967); G. Jurow, "New Data on the Effect of a 'Death Qualified' Jury on the Guilt Determination Process," 84 Harv. L. Rev. 567 (1971) (data collected prior to 1970 from 211 New York employees of Sperry Rand Corporation); L. Harris & Associates, Inc., "Study No. 2016" (1971), reported in W. White, "The Constitutional Invalidity of Convictions, Imposed by Death-Qualified Juries," 58 Cornell L. Rev. 1176 (1973) (data collected in 1971 from 2068 adults throughout United States).

[12] E. Bronson, "On the Conviction Proneness and Representativeness of the Death-Qualified Jury: An Empirical Study of Colorado Veniremen," 42 U. Colo. L. Rev. 1 (1970) (data collected in 1968 and 1969 in Colorado); E. Bronson, "Does the Exclusion of Scrupled Jurors in Capital Cases Make the Jury More Likely to Convict? Some Evidence from California," 3 Woodrow Wilson J.L. 11 (1980) (data collected in 1969 and 1970 in California); R. Fitzgerald & P. Ellsworth, "Due Process vs. Crime Control: Death Qualification and Jury Attitudes," 8 Law & Hum. Behav. 31 (1984) (data collected in 1979); P. Ellsworth, R. Bukaty, C. Cowan & W. Thompson, "The Death-Qualified Jury and the Defense of Insanity," 8 Law & Hum. Behav. 81 (1984) (data collected in California; thirty-five participants); W. Thompson, C. Cowan, P. Ellsworth & J. Harrington, "Death Penalty Attitudes and Convic-

on the death penalty and attitudes regarding certain other aspects of the criminal justice process, the *untested assumption* being that persons with "proprosecution" attitudes vote to convict criminal defendants more often than persons with "prodefense" attitudes. None of the eight studies involved an actual, or even a simulated, jury experience in which study participants: (1) were instructed as to the presumption of innocence and the obligation to decide the case solely on the evidence and in accordance with the court's instructions regarding the law; or (2) participated, under oath, in deliberations regarding a "defendant's" innocence or guilt. We are not persuaded that the correlation these studies purport to have established between death penalty attitudes and certain other criminal justice attitudes is capable of either: (1) predicting jury voting behavior; or (2) establishing the defendant's hypothesis regarding the effect that identification and excusal for cause of certain venirepersons—individuals whose views on the death penalty would preclude them for serving as jurors at the sentencing phase, but not at the guilt phase, of the trial—has upon jury voting behavior. Accord id.

The final study on which the defendant relies is documented in C. Cowan, W. Thompson & P. Ellsworth, "The Effects of Death Qualification on Jurors' Predisposition to Convict and on the Quality of Deliberation," 8 Law & Hum. Behav. 53, 62–63 (1984) (Ellsworth Conviction Proneness Study). This study is not based on current Connecticut data. Instead, it is based on data

tion Proneness: The Translation of Attitudes into Verdicts," 8 Law & Hum. Behav. 95 (1984) (data collected in California; thirty-six participants); C. Haney, "On the Selection of Capital Juries: The Biasing Effects of the Death-Qualification Process," 8 Law & Hum. Behav. 121 (1984) (data collected in California; sixty-seven participants); L. Harris & Associates, Inc., "Study No. 814002" (1981) (unpublished); R. Seltzer, G. Lopes, M. Dayan & R. Canan, "The Effect of Death Qualification on the Propensity of Jurors to Convict: The Maryland Example," 29 How. L.J. 571 (1986) (data collected in 1983).

that was collected twenty years ago in California[13] from only 240 individuals. "Voir dire" took place during *telephone interviews in which subjects were asked only two multiple choice questions*: (1) " 'Is your attitude toward the death penalty such that as a juror you would never be willing to impose it in any case, no matter what the evidence was, or would you consider voting to impose it in at least some cases? a) I would be unwilling to vote to impose it in any case. b) I would consider voting to impose it in some cases' "; and (2) " 'Which of the following expresses what you would do if you were a juror for the first part of the trial? a) I would follow the [court's] instructions and decide the question of guilt or innocence in a fair and impartial manner based on the evidence and the law. or b) I would not be fair and impartial in deciding the question of guilt or innocence, knowing that if the person was convicted he or she might get the death penalty.' "[14] No *further* attempt was made to verify that the respondents were willing and able to put aside preconceived notions and decide a case solely on the basis of the evidence presented and in accordance with a court's instructions regarding the law. In addition, no attempt was made to ascertain whether respondents would be unable to serve as jurors because their views in favor of the death penalty would cause them automatically to impose a sentence of death. See *Morgan* v. *Illinois*, supra, 504 U.S. 735–36. Even assuming, without deciding, that the Ellsworth Conviction Proneness Study is methodologically sound, we do not believe that the "death qualification" process utilized in the study, which entailed *only two multiple choice questions posed over the telephone*, reasonably can be said to be representative of either the process by which venirepersons in Connecticut are questioned during voir dire about their death penalty

---

[13] See *Grigsby* v. *Mabry*, supra, 758 F.2d 234.

[14] Ellsworth Conviction Proneness Study, supra, pp. 62–63.

attitudes or of the process by which venirepersons who have preconceived notions and biases that would preclude them from serving as jurors are culled from a Connecticut venire panel. For example, jury selection in the present case consumed forty full days during which the questioning of individual venirepersons lasted as long as two hours. We also are not persuaded that a single study based on data collected approximately twenty years ago from 240 California residents provides a proper basis for taking judicial notice that, despite the state constitutional guarantee of individual voir dire and peremptory challenges, the excusal for cause, prior to the guilt phase of a capital felony trial, of venirepersons whose views about the death penalty would prevent or substantially impair the performance of their duties as jurors during the sentencing phase, but not at the guilt phase, of the trial, results in a more "conviction-prone" jury in Connecticut in 1999. The individuals questioned for the Ellsworth Conviction Proneness Study did not serve under oath as jurors in an actual capital trial and, once they had given two multiple choice answers regarding their beliefs concerning the death penalty, were not subjected to further voir dire scrutiny to ensure that they were capable of deciding the case solely on the basis of the evidence and in accordance with the law.

Connecticut experience, moreover, does not support the defendant's hypothesis that the death qualification procedure utilized at her trial results in a more "conviction prone" jury. For example, in a capital felony case now pending before this court, *State* v. *Johnson*, Docket No. SC 14801, the trial court excused for cause twenty-seven venirepersons who stated during voir dire that the death penalty should be imposed automatically in that case. Only seventeen venirepersons were excused on the basis of their opposition to the death penalty. See *State* v. *Ellis*, 224 Conn. 711, 724, 621 A.2d 250

(1993) (judicial notice properly may be taken of files of Superior Court cases); *McCarthy* v. *Commissioner of Correction*, 217 Conn. 568, 580 n.15, 587 A.2d 116 (1991) (same). Put another way, in *State* v. *Johnson*, supra, the death qualification process resulted in the excusal for cause of twenty-seven supposedly "proconviction" venirepersons and only seventeen supposedly "proacquittal" venirepersons. Thus, even if we were to assume, without deciding, that, as the defendant maintains, death penalty beliefs are predictive of jury voting behavior, we still could not conclude that "death qualification" results in a Connecticut jury that is more, rather than less, "conviction prone."

To summarize, none of the *Geisler* factors supports the defendant's state constitutional claim. The state has a valid and important interest in having the same jury serve at the guilt and penalty phases of a capital felony trial. See *State* v. *Webb*, supra, 238 Conn. 467 ("In most capital cases, the evidence presented to demonstrate the defendant's guilt also will be relevant to the determination of the existence of aggravating factors. . . . Thus, if different juries were required to consider the guilt and penalty issues, much of the same evidence would be likely to be presented to each of the juries." [Citation omitted.]). We conclude that article first, § 8, of the constitution of Connecticut incorporates the standard of "impartial jury" provided by the federal constitution, namely, a jury that is: (1) composed of individuals able to decide the case solely on the evidence and in accordance with the court's instructions regarding the law; and (2) properly selected from a venire panel that is composed of a representative cross section of the community. Identification and excusal for cause, prior to the guilt phase of a capital felony trial, of venirepersons whose views concerning the death penalty preclude them from serving as jurors at the sentencing phase, but not at the guilt phase, of the trial does not

violate the state constitutional guarantee of trial by an impartial jury.

Finally, we note that, as a practical matter, the standard of "impartial jury" advocated by the defendant would require not only that jurors be able to set aside preconceived notions and decide a case solely on the evidence and in accordance with the court's instructions, but also that "proprosecution" and "prodefense" attitudes—the very attitudes that the jurors have been determined to be capable of setting aside and that the jurors are sworn to set aside—be balanced across the jury. Even if we were to assume, without deciding, that it somehow would be possible to ascertain and balance jurors' criminal justice attitudes across a jury, the defendant's proposed standard of "impartial jury" still would not be workable because it effectively would require the elimination of the use of peremptory challenges— challenges that are guaranteed by article first, § 19, of the constitution of Connecticut.

## II

The defendant next claims that the trial court improperly excused venireperson F.V. because of her opposition to the death penalty. Specifically, the defendant claims that the court improperly concluded that F.V.'s beliefs concerning capital punishment would prevent or substantially impair her ability to perform her duties as a juror in accordance with the court's instructions and the juror's oath.[15] See *Wainwright* v. *Witt*, supra, 469 U.S. 419–21. We disagree.

---

[15] The defendant has not raised this claim as a matter of independent state constitutional law, and she does not dispute that the *Witt* standard, which currently serves as the relevant standard for evaluating federal constitutional claims, governs the propriety of the trial court's ruling. The *Witt* standard permits the excusal for cause of venirepersons whose beliefs concerning capital punishment would prevent or substantially impair the performance of their duties as jurors. *Wainwright* v. *Witt*, supra, 469 U.S. 419–21.

"Our constitutional and statutory law permit each party, typically through his or her attorney, to question each prospective juror individually, outside the presence of other prospective jurors, to determine the venireperson's fitness to serve on the jury. Conn. Const., art. I, § 19; General Statutes § 54-82f; Practice Book § [42-12].[16] After the completion of the voir dire of a particular venireperson, a party may challenge the venireperson for cause. The court must excuse that juror if the 'judge . . . is of the opinion from the examination that [the] juror would be unable to render a fair and impartial verdict . . . .' General Statutes § 54-82f; Practice Book § [42-12]." *State* v. *Robinson,* supra, 237 Conn. 247–48. The trial court is vested with wide discretion in determining the competency of jurors to serve. *State* v. *Day,* 233 Conn. 813, 843, 661 A.2d 539 (1995); *State* v. *Tucker,* supra, 226 Conn. 630; *State* v. *Esposito,* supra, 223 Conn. 310; *State* v. *Pelletier,* 209 Conn. 564, 572, 552 A.2d 805 (1989); *State* v. *Cubano,* supra, 203

[16] General Statutes § 54-82f provides: "In any criminal action tried before a jury, either party shall have the right to examine, personally or by his counsel, each juror outside the presence of other prospective jurors as to his qualifications to sit as a juror in the action, or as to his interest, if any, in the subject matter of the action, or as to his relations with the parties thereto. If the judge before whom the examination is held is of the opinion from the examination that any juror would be unable to render a fair and impartial verdict, the juror shall be excused by the judge from any further service upon the panel, or in the action, as the judge determines. The right of such examination shall not be abridged by requiring questions to be put to any juror in writing and submitted in advance of the commencement of said action."

Practice Book § 42-12 provides: "Each party shall have the right to examine, personally or by counsel, each juror outside the presence of other prospective jurors as to qualifications to sit as a juror in the action, or as to interest, if any, in the subject matter of the action, or as to relations with the parties thereto. If the judicial authority before whom such examination is held is of the opinion from such examination that any juror would be unable to render a fair and impartial verdict, such juror shall be excused by the judicial authority from any further service upon the panel, or in such action, as the judicial authority determines. The right of such examination shall not be abridged by requiring questions to be put to any juror in writing and submitted in advance of the commencement of the trial."

Conn. 88–89; *State* v. *Ziel*, supra, 197 Conn. 65; *State* v. *Anthony*, 172 Conn. 172, 175, 374 A.2d 156 (1976). "[T]he exercise of [the trial court's] discretion will not constitute reversible error unless it has clearly been abused or harmful prejudice appears to have resulted." (Internal quotation marks omitted.) *State* v. *Faust*, 237 Conn. 454, 462, 678 A.2d 910 (1996); *State* v. *Skipper*, 228 Conn. 610, 625, 637 A.2d 1101 (1994).

During voir dire, F.V. stated: "I don't believe in the death penalty," and "I can't justify the death penalty for any reason." She further stated that: she automatically would vote against the death penalty; her "mind ain't open to the death penalty"; she could not fairly consider both options for penalty; she could not participate in the process; she "couldn't be open minded towards a death penalty"; the death penalty is "just as bad as the person who has committed a murder"; and she "wouldn't vote for a death penalty."

F.V. also stated, however, that: she could be fair in evaluating the evidence of aggravating and mitigating factors; she "would follow the law that [the court] described"; even "knowing that [the judge] would be bound by the jury's decision, [she] could still be fair in analyzing the evidence that might be presented [regarding] aggravating and mitigating factors"; her "personal views . . . would make [her] feel uncomfortable, but they wouldn't make [her] unfair"; her views on the death penalty would not cause her "to go easy on [the defense] when [it tries] to show the jury reasons for life"; she could not overlook whatever was proven because of her beliefs; her strong feelings would not interfere with her ability to be a juror; and she would not automatically vote against the death penalty.

Relying on F.V.'s inherently contradictory statements, the trial court reasonably could have concluded

that F.V.'s opposition to the death penalty would substantially impair her ability to perform the duties of a juror in accordance with the court's instructions and the juror's oath. *Wainwright* v. *Witt*, supra, 469 U.S. 419–21; see also *State* v. *Tucker*, supra, 226 Conn. 644 (venireperson's personal assurance of impartiality is not dispositive of that individual's ability to serve as impartial juror); *State* v. *Cubano*, supra, 203 Conn. 92 (same). The trial court, therefore, acted well within its discretion in excusing F.V. from service as a juror on the basis of her opposition to the death penalty.

## III

The defendant's final claim is that the trial court's instruction to the jury regarding proximate cause[17] was flawed. We disagree.

---

[17] With respect to proximate cause, the trial court instructed the jury: "I'm focusing your attention now on an additional instruction on the second element in each murder and that is causation. In each of the two murders the state has to prove beyond a reasonable doubt, that's the second element in each, that the defendant did cause the death of Miss Steller in count one and the defendant did cause the death of Mr. Ronald King in count two.

"So, the second element in each count of murder is that the defendant did cause the death of Miss Steller and Mr. Ronald King, respectively. This means that [the defendant's] conduct, and again, when I talk about conduct I'm talking about the acts that she allegedly committed at that date at that time. This means that [the defendant's] conduct was the proximate cause of the death of Patricia Lynn Steller and Ronald King, respectively. And this definition that is going to follow applies to each count of murder.

"An act or an omission to act is the proximate cause of death when it substantially and materially contributes in a natural and continuous sequence unbroken by an intervening cause to the resulting death. It is the cause without which the death would not have occurred and it is a predominating cause, a substantial factor from which death followed as a natural, direct, and immediate consequence. Where the death or injury caused by [the defendant's] conduct is a foreseeable and natural result of that conduct, the law considers the chain of causation unbroken and holds the defendant . . . criminally responsible.

"The state must prove beyond a reasonable doubt in each count that the defendant caused the death of the particular individual. This means that the defendant's conduct was the proximate cause of the victim[s'] death[s]. An act is the proximate cause when it substantially and materially in a natural and continuous sequence unbroken by an intervening cause contributes to the resulting death.

"Our analysis begins with a well established standard of review. When reviewing [a] challenged jury instruction . . . we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety,

"Now, there is evidence put before you and it's for you to decide. Anything I say here is subservient to your finding whatever facts have been proven to you. Your finding of facts is controlling. There is evidence of another party present at the premises of 14 Red Orange Road on the afternoon of November 1, 1993 and that individual is Gordon 'Butch' Fruean. It is not essential that the defendant . . . be the sole cause of death. It is not essential that her act or acts be the immediate cause of death. It is essential the physical acts of [the defendant] be a substantial factor in bringing about the death. So, where a wound has been a substantial factor in causing a death, it is still to be regarded as the cause of death even though the infliction of wounds by another is a contributing factor.

"The act or acts of the defendant, to be the proximate cause, must be a substantial factor in producing death and to be a substantial factor in producing death the act must have continued down to the moment of injury or the death or at least down to the setting in motion of the final injurious force which materially produced or preceded the death.

"If you find that the act or acts of both these parties were substantial factors in producing the particular deaths then any contributing act by Fruean will not relieve the defendant of responsibility.

"There may be situations when the defendant's conduct is a cause in fact of the victim's death but an act or force intervenes in such a way to relieve a defendant whose conduct contributed in fact to the victim's death from responsibility. You may find that some other circumstances subsequently occurred, the course of which may be an act by another person that does more than supply a concurring or contributing cause of death but is unforeseeable and sufficiently powerful in its effect to relieve the defendant of criminal responsibility for her conduct.

"To be relieved of criminal responsibility the efficient intervening cause that produced the death must supersede the defendant's conduct. In order for [the defendant] to be relieved of responsibility under this theory of efficient intervening cause by another, you must find that the defendant and Mr. Fruean were not acting jointly to commit the death and the superseding conduct of Fruean was unforeseeable.

"Whether circumstances subsequent to the defendant's conduct constitute a concurring or contributing cause of death, which will not relieve [the defendant] of criminal responsibility or constitute a superseding efficient intervening cause of death, which would relieve the defendant of responsibility, are questions of fact for the jury.

"If you find that the defendant's conduct was the proximate cause of the victim[s'] death[s] you should also consider whether Mr. Fruean engaged in any conduct which caused the death[s] of the victim[s]. If you find there is such evidence, you must decide whether Mr. Fruean's conduct just contrib-

read as a whole, and judged by its total effect rather than by its individual component parts. . . . [T]he test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper. . . . *State* v. *Denby*, 235 Conn. 477, 484–85, 668 A.2d 682 (1995). [I]n appeals involving a constitutional question, [the standard is] whether it is reasonably possible that the jury [was] misled. . . . *State* v. *Figueroa*, 235 Conn. 145, 170–71, 665 A.2d 63 (1995)." (Internal quotation marks omitted.) *State* v. *Delgado*, 247 Conn. 616, 625, 725 A.2d 306 (1999).

"In determining whether it was . . . reasonably possible that the jury was misled by the trial court's instructions, the charge to the jury is not to be critically dissected for the purpose of discovering possible inaccuracies of statement, but it is to be considered rather as to its probable effect upon the jury in guiding them to a correct verdict in the case. . . . The charge is to be read as a whole and individual instructions are not to be judged in artificial isolation from the overall charge. . . . The test to be applied . . . is whether the charge, considered as a whole, presents the case to the jury so that no injustice will result. . . . *State* v. *Prioleau*, 235 Conn. 274, 284, 664 A.2d 743 (1995); accord

uted or cooperating cause of death or whether Mr. Fruean's conduct to operate to supersede as an efficient intervening cause that produced the victim[s'] death[s].

"If Mr. Fruean's conduct combined with the defendant's to cause the victims' death[s], the defendant is not relieved of criminal responsibility. If Mr. Fruean's conduct was unforeseen and sufficiently powerful to supersede the defendant's conduct in causing the victim[s'] death[s], then he would be an intervening cause that produced the death and the defendant would be relieved of criminal responsibility in the death of that particular victim."

*State* v. *Faust*, [supra, 237 Conn. 473–74]; see also *State* v. *Hines*, 243 Conn. 796, 818–19, 709 A.2d 522 (1998)." (Internal quotation marks omitted.) *State* v. *Schiappa*, 248 Conn. 132, 171, 728 A.2d 466 (1999).

The defendant first maintains that the trial court's instruction misled the jury by allowing it to believe that it could convict the defendant of murder even if the state did not prove causation. Specifically, the defendant contends that by stating to the jury that "to be a substantial factor in producing the death the act must have continued down to the moment of injury or the death or at least down to the setting in motion of the final injurious force which materially produced or preceded the death," the trial court permitted the jury to convict the defendant of murder even if it concluded that: (1) the defendant did not inflict any wounds; (2) she merely inflicted superficial wounds; or (3) she only committed nonfatal acts such as breaking the lamp and glass jar over the victims' heads. The trial court, however, also instructed the jurors that "the state has to prove beyond a reasonable doubt that the defendant did . . . cause the [victims'] death"; that "[a]n act . . . is the proximate cause of death when it substantially and materially contributes . . . to the resulting death. It is the cause without which the death would not have occurred and it is a predominating cause, a substantial factor from which death followed as a natural, direct, and immediate consequence"; that "[t]he state must prove beyond a reasonable doubt . . . that the defendant caused the death of the particular individual"; that "[a]n act . . . is the proximate cause of death when it substantially and materially contributes . . . to the resulting death"; and that "[i]t is essential the physical acts of [the defendant] be a substantial factor in bringing about the death." There is no reasonable possibility that the jury was misled into believing that it properly could convict the defendant of the victims' murders without

first finding that the defendant had committed acts that caused the victims' deaths.

The defendant also maintains that the trial court's instruction misled the jury by allowing it to convict the defendant even if it concluded that she had been only an accessory to the murders. The defendant impliedly contends that by stating to the jury that *"in order for [the defendant] to be relieved of responsibility* under this theory of efficient intervening cause . . . you must find that the defendant and Mr. Fruean were not acting jointly to commit the death"; (emphasis added); the trial court permitted the jury to convict the defendant of murder without first finding that she herself had caused the victims' deaths. The statement upon which the defendant relies, however, clearly indicates that the jury was to consider the question of joint action only if it had first determined that the defendant's conduct was responsible for the victims' deaths. There is no reasonable possibility that the jury was misled into believing that the defendant properly could be convicted of the victims' murders without a finding that the defendant's own actions had caused the victims' deaths.

The judgment is affirmed.

In this opinion BORDEN, PALMER and MCDONALD, Js., concurred.

BERDON, J., dissenting. The majority today holds, for the first time under our state constitution, that the state may death qualify the jury that decides the *guilt* of the defendant in a capital case by allowing the court to excuse for cause those persons who, because of their opposition to the death penalty, are incapable of voting for it.[1] The death qualified jury is "tilted in favor of the

---

[1] "A death-qualified jury is one from which prospective jurors have been excluded for cause in light of their inability to set aside their views about the death penalty that would prevent or substantially impair the performance of [their] duties as [jurors] in accordance with [their] instructions and [their] oath." (Internal quotation marks omitted.) *Buchanan* v. *Kentucky*, 483 U.S. 402, 408 n.6, 107 S. Ct. 2906, 97 L. Ed. 2d 336 (1987).

prosecution by the exclusion of a group of prospective jurors [who are] uncommonly aware of an accused's constitutional rights but quite capable of determining his culpability without favor or bias."[2] *Lockhart* v. *McCree*, 476 U.S. 162, 185, 106 S. Ct. 1758, 90 L. Ed. 2d 137 (1986) (Marshall, J., dissenting). Although the *Lockhart* court held that such a jury passes federal constitutional muster,[3] I believe that the death qualification of the jury violates article first of the Connecticut constitution, which, pursuant to § 8 and § 19, guarantees the right to an impartial jury drawn from a representative cross section of the people and due process of law.[4]

I

The majority would have us believe that in those cases in which the state seeks the death penalty, the accused cannot have the benefit of a jury selected from

[2] See part III D of this dissent.

[3] Nevertheless, even under the federal constitution "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction. No defendant can constitutionally be put to death at the hands of a tribunal so selected." *Witherspoon* v. *Illinois*, 391 U.S. 510, 522–23, 88 S. Ct. 1770, 20 L. Ed. 2d 776 (1968).

[4] Article first, § 8, of the Connecticut constitution provides: "In all criminal prosecutions, the accused shall have a right to be heard by himself and by counsel; to be informed of the nature and cause of the accusation; to be confronted by the witnesses against him; to have compulsory process to obtain witnesses in his behalf; to be released on bail upon sufficient security, except in capital offenses, where the proof is evident or the presumption great; and in all prosecutions by indictment or information, to a speedy, public trial by an impartial jury. No person shall be compelled to give evidence against himself, nor be deprived of life, liberty or property without due process of law, nor shall excessive bail be required nor excessive fines imposed. No person shall be held to answer for any crime, punishable by death or life imprisonment, unless on a presentment or an indictment of a grand jury, except in the armed forces, or in the militia when in actual service in time of war or public danger."

Article first, § 19, of the Connecticut constitution provides: "The right of trial by jury shall remain inviolate."

a cross section of the population that determines his guilt. Any other criminal defendant, that does not face this ultimate penalty, has the benefit of a group of persons summoned to serve potentially as jurors that includes those who are opposed to the death penalty on moral or other grounds and would not vote for it. Similarly, if the state decides not to seek the death penalty, the defendant is able to have a representative venire. The trial court in this case needlessly excluded those prospective jurors (venirepersons) from the guilt phase of the trial thereby violating the defendant's state constitutional rights.[5]

The significance of that exclusion as explained by Justice Marshall (joined by Justices Brennan and Stevens), is that there is "overwhelming evidence that death-qualified juries are substantially more likely to convict or to convict on more serious charges than juries on which unalterable opponents of capital punishment are permitted to serve." Id., 184 (Marshall, J., dissenting). I agree with Justice Marshall who cogently wrote in dissent: "With a glib nonchalance ill suited to the gravity of the issue presented and the power of [the] respondent's claims, [this] Court upholds a practice that allows the State a special advantage in those prosecutions where the charges are the most serious and the possible punishments, the most severe. The State's mere announcement that it intends to seek the death penalty if the defendant is found guilty of a capital offense will, under today's decision, give the prosecution license to empanel a jury especially likely to return that very verdict. Because I believe that such a blatant disregard for the rights of a capital defendant offends logic, fairness, and the Constitution, I dissent." Id., 185.

---

[5] As a result of the trial court's voir dire of the venirepersons regarding their opposition to the death penalty in this case, twelve out of 157, or nearly 8 percent, were excused from serving because they opposed the death penalty and could not put that belief aside if selected.

The consequences of the majority upholding this automatic exclusion can be significant—in Connecticut, those persons who are opposed to the death penalty and who potentially could not put that belief aside amount to approximately 39 percent of our state population[6] as measured by the legislators who voted against the death penalty.[7] Based on this assumption, Connecticut voters are less supportive of the death penalty than the national population.[8]

## II

Before I proceed with my state constitutional analysis, let me put this case in its proper perspective. The defendant, Janet Griffin, like the defendant in *Lockhart*, does not claim that those who are opposed to the death penalty and cannot put that belief aside should *not* be excluded from the *penalty* phase of the trial if the defendant is found guilty of capital felony pursuant to General Statutes § 53a-54b. Rather, the defendant maintains that her constitutional rights are violated if the jury that deliberates her guilt at trial is death qualified. All that the defendant asks, as in *Lockhart*, is that her guilt or innocence be determined by a jury like those that sit in noncapital cases—one whose composition is not prosecution oriented and conviction prone.

Our state statutory scheme can accommodate both the defendant's constitutional right to have her guilt

---

[6] In 1973, there was a vote on House Bill No. 8297, the bill underlying General Statutes § 53a-54b, which provides for the penalty of death. In the House of Representatives, 37 percent of the legislators and in the Senate, 47 percent of the senators voted against the death penalty. Overall, based on the total number of senators and representatives, 39 percent were not in favor of the death penalty.

[7] See footnote 6 of this dissent.

[8] According to a Gallup Poll conducted in 1999, 22 percent of the population answered that they were "against" when asked: "Are you in favor of the death penalty for a person convicted of murder?" The sample was 543 adults. The statistic's margin of error was plus or minus five percentage points. See M. Gillespie, Public Opinion Supports Death Penalty, Gallup News Service, February 24, 1999, p. 2.

or innocence decided by a jury that is drawn from a representative cross section of the population and the state's right to exclude in the penalty phase of a capital case those who could not put aside their opposition in deciding whether to impose the death penalty. If the defendant is found guilty of a capital felony by a jury that includes jurors who would not vote for the penalty of death based upon moral or other grounds, General Statutes § 53a-46a (b) clearly authorizes the trial court to impanel a second jury that could be death qualified to determine the penalty.[9] Similarly, the United States Supreme Court, in *Witherspoon* v. *Illinois*, 391 U.S. 510, 520 n.18, 88 S. Ct. 1770, 20 L. Ed. 2d 776 (1968), recognized the appropriateness of a bifurcated trial when a death qualified jury could not be impartial.[10]

We have in the past insulated the jury from being exposed to prejudicial information by bifurcating capital trials. In *State* v. *Jones*, 234 Conn. 324, 334, 662 A.2d 1199 (1995), the defendant moved to bifurcate the trial to prevent the jury from hearing evidence of his prior murder conviction before they determined whether he was guilty of the capital felony that was at issue before them. This court determined that the trial court should bifurcate the trial in cases where there was a risk of

[9] General Statutes § 53a-46a (b) (2) (C) provides that such hearing to determine the penalty shall be conducted before another jury "if the jury which determined the defendant's guilt has been discharged by the court for good cause . . . ."

[10] "Even so, a defendant convicted by such a jury in some future case might still attempt to establish that the jury was less than neutral with respect to guilt. If he were to succeed in that effort, the question would then arise whether the State's interest in submitting the penalty issue to a jury capable of imposing capital punishment may be vindicated at the expense of the defendant's interest in a completely fair determination of guilt or innocence—given the possibility of accommodating both interests by means of a bifurcated trial, using one jury to decide guilt and another to fix punishment. That problem is not presented here, however, and we intimate no view as to its proper resolution." *Witherspoon* v. *Illinois*, supra, 391 U.S. 520 n.18.

substantial prejudice. Id., 343–51. Because the trial court failed to bifurcate the trial in *Jones*, we reversed his conviction and ordered a new trial. Id., 359. We made clear that "the risk of such substantial prejudice is not outweighed by the state's interest in judicial economy." Id., 346. The majority simply ignores the precedential effect of *Jones*, which requires that the trial court bifurcate the trial when there is a risk of substantial prejudice.

Indeed, because of the risk of substantial prejudice and in the interests of doing justice, there should be no need to rely on the state constitution to require bifurcation. Rather, under our "inherent supervisory authority over the administration of justice"; *State* v. *Patterson*, 230 Conn. 385, 397, 645 A.2d 535 (1994), on appeal after remand, 236 Conn. 561, 674 A.2d 416 (1996); common sense mandates that the guilt phase should be bifurcated and if the defendant is found guilty, the penalty phase be tried before another jury to exclude those jurors who would not vote for the penalty of death under any circumstances.

### III

Despite the majority's failure to ensure that the defendant's trial was fair by ordering a bifurcation of her trial under our supervisory powers, the state constitution requires that a death qualified jury cannot decide the defendant's guilt or innocence in a capital case. Justice Glass eloquently reminded us in *State* v. *Oquendo*, 223 Conn. 635, 649, 613 A.2d 1300 (1992), that "[i]t is well established that federal constitutional and statutory law establishes a minimum national standard for the exercise of individual rights and does not inhibit state governments from affording higher levels of protection for such rights. . . . Although we have often relied upon decisions of the United States Supreme Court interpreting the [federal constitution] to define

the protections provided by related provisions of our state constitution, we have at times determined that the state constitution affords greater protections to the citizens of Connecticut than does the federal constitution, as interpreted by the United States Supreme Court. . . . We have stated, moreover, that [t]he Connecticut constitution is an instrument of progress, it is intended to stand for a great length of time and should not be interpreted too narrowly or too literally so that it fails to have contemporary effectiveness for all of our citizens." (Citations omitted; internal quotation marks omitted.)

Our interpretation of when the state constitution affords greater individual rights than the federal constitution is guided by the *Geisler* factors: "In order to construe the contours of our state constitution and reach reasoned and principled results, the following tools of analysis should be considered to the extent applicable: (1) the *textual approach*; see, e.g., *Stolberg* v. *Caldwell*, 175 Conn. 586, 597–98, 402 A.2d 763 (1978), appeal dismissed sub nom. *Stolberg* v. *Davidson*, 454 U.S. 958, 102 S. Ct. 496, 70 L. Ed. 2d 374 (1981) ('Unless there is some clear reason for not doing so, effect must be given to every part of and each word in the constitution.'); (2) *holdings and dicta of this court, and the Appellate Court*; see, e.g., *Doe* v. *Maher*, 40 Conn. Sup. 394, 448–49, 515 A.2d 134 (1986) (trial court used strict scrutiny to analyze sex discrimination claim based on the equal protection clause of the state constitution, relying, in part, on dicta from the Connecticut Supreme Court regarding what standard would be used once Connecticut's equal rights amendment was adopted); (3) *federal precedent*; see, e.g., *State* v. *Lamme*, 216 Conn. 172, 184, 579 A.2d 484 (1990) ('The adoption of federal constitutional precedents that appropriately illuminate open textured provisions in our own organic document in no way compromises our obligation independently to construe the provisions of our state constitution.'); (4) *sister state decisions* or sibling approach;

see, e.g., *State* v. *Gethers*, 197 Conn. 369, 386–87, 497 A.2d 408 (1985); *Cologne* v. *Westfarms Associates*, [192 Conn. 48, 58–59, 469 A.2d 1201 (1984)]; (5) the *historical approach*, including the historical constitutional setting and the debates of the framers; see, e.g., *State* v. *Lamme*, supra, 178–80; *Cologne* v. *Westfarms Associates*, supra, 60–62; *Palka* v. *Walker*, 124 Conn. 121, 126, 198 A. 265 (1938); and (6) *economic/sociological considerations.* See *State* v. *Barton*, [219 Conn. 529, 546, 594 A.2d 917 (1991)]; *State* v. *Dukes*, [209 Conn. 98, 114–15, 547 A.2d 10 (1988) ('Constitutional provisions must be interpreted within the context of the times. . . . We must interpret the constitution in accordance with the demands of modern society or it will be in constant danger of becoming atrophied and, in fact, may even lose its original meaning.' [Citations omitted; internal quotation marks omitted.]); see generally *State* v. *Jewett*, 146 Vt. 221, 500 A.2d 233 (1985); M. Margulies, 'Connecticut's Free Speech Clauses: A Framework and an Agenda,' 65 Conn. B.J. 437 (1991) (an analytical framework for state constitutional analysis in the context of the free speech clauses); E. Peters, 'State Constitutional Law: Federalism in the Common Law Tradition,' 84 Mich. L. Rev. 583 (1986) (book review)." (Emphasis in original.) *State* v. *Geisler*, 222 Conn. 672, 684–86, 610 A.2d 1225 (1992). Although the majority purports to be guided by these factors, they do so with their heads buried deeply in the sand. In my view, under an appropriate analysis of our state constitution, bifurcation of the guilt and penalty phases in a capital trial are mandated if necessary to assure that the jurors for the guilt phase are not death qualified.

## A

### Text of the Constitution

The plain language of the state constitution guarantees a criminal defendant the right to a trial by an

impartial jury. Article first, § 8, expressly provides that the criminal defendant has a "right to . . . public trial by an impartial jury," and § 19 adds that this "right of trial by jury shall remain inviolate." The right to an impartial jury is grounded on the concern that the criminal defendant not be "deprived of life, liberty or property without due process of law . . . ." Conn. Const., art. I, § 8. Thus, the constitution guarantees to a criminal defendant certain due process rights before exacting the ultimate punishment of death.

When a trial court death qualifies the jury, it guarantees the state that the pool from which the jury is selected will be more prosecution oriented and conviction prone.[11] This compels the conclusion that the defendant's right to a trial by an impartial jury drawn from a venire based upon a representative cross section of our population and due process rights are violated when the jury is death qualified.

### B

### Holding and Dicta of Connecticut Courts

The right to an impartial jury has been interpreted to mean that the jury must be drawn from a representative cross section of the community. See *State* v. *Nims*, 180 Conn. 589, 594–95, 430 A.2d 1306 (1980) ("[a]n essential component of the right to trial by jury is the right to select a petit jury from a representative cross section of the community"). The fair cross section requirement "is part of the established tradition in the use of juries as instruments of public justice that the jury be a body truly representative of the community." *Smith* v. *Texas*, 311 U.S. 128, 130, 61 S. Ct. 164, 85 L. Ed. 84 (1940); *Williams* v. *Coppola*, 41 Conn. Sup. 48, 54, 549 A.2d 1092 (1986).[12]

---

[11] See part III D of this dissent.

[12] In *Williams* v. *Coppola*, supra, 41 Conn. Sup. 60, the trial court held that, a party's "use of peremptory challenges to exclude prospective jurors solely on the basis of membership in a cognizable group, within the meaning

When a jury is derived from a cross section of the community, it ensures "diffused impartiality." *Thiel* v. *Southern Pacific Co.*, 328 U.S. 217, 227, 66 S. Ct. 984, 90 L. Ed. 1181 (1946); *Williams* v. *Coppola*, supra, 41 Conn. Sup. 54. "The rationale of these decisions, often unstated, is that in our heterogeneous society jurors will inevitably belong to diverse and often overlapping groups defined by race, religion, ethnic or national origin, sex, age, education, occupation, economic condition, place of residence, and political affiliation; that it is unrealistic to expect jurors to be devoid of opinions, preconceptions, or even deep-rooted biases derived from their life experiences in such groups; and hence that the only practical way to achieve an overall impartiality is to encourage the representation of a variety of such groups on the jury so that the respective biases of their members, to the extent they are antagonistic, will tend to cancel each other out." (Internal quotation marks omitted.) *Williams* v. *Coppola*, supra, 54–55.

As long as the venire is derived from a cross section of the community, there is no constitutional guarantee that the jury composition will be representative. "The random drawing of petit jurors from the venire is by its very nature inconsistent with any guarantee of a particular resulting composition. . . . Not every jury must contain representatives of all the economic, social, religious, racial, political and geographical groups of the community. . . . Indeed, the impracticability of attempting to achieve a [particular composition] is obvious." (Citations omitted; internal quotation marks omitted.) Id., 55–56.

"This, however, does not mean that the constitutional right to an impartial jury ceases to be operative during

of the representative cross-section rule, violates a party's state constitutional right to trial by jury in both civil and criminal cases."

the selection of the petit jury. If this were so there would be no purpose for mandating that the venire be composed of a cross section of the population. No defendant has ever been tried before a venire; the venire is not the body that deliberates in the jury room; no defendant has ever been found guilty by a venire. If there is a . . . [constitutional] requirement that the venire represent a fair cross section of the community, it must logically be because it is important that the defendant have the chance that the petit jury will be similarly constituted." (Internal quotation marks omitted.) Id., 56.

"It follows, then, that the state constitutional right to trial by an impartial jury guarantees a party not the right to a jury composed of a cross section of the population, but a fair chance of obtaining such a jury. . . . In other words, a petit jury is inevitably . . . affected by the vicissitudes of the draw . . . . Accordingly, those procedures used to select the petit jury during the voir dire that may interfere with the chance that the petit jury will represent a fair cross section of the community are subject to constitutional scrutiny of the right to trial by jury under both §§ 8 (criminal) and 19 (civil) of article first [of the Connecticut constitution]." (Citations omitted; internal quotation marks omitted.) Id.

Guaranteeing that the jury that determines the guilt of the defendant be drawn from a representative cross section of the community is essential for all criminal cases but particularly in a capital case because "a jury that must choose between life imprisonment and capital punishment can do little more—and must do nothing less—than express the conscience of the community on the ultimate question of life or death." *Witherspoon* v. *Illinois,* supra, 391 U.S. 519.

## C

## Federal Precedent

The United States Supreme Court has held that a jury cannot be representative when certain groups are systematically excluded from the jury selection process. In *Duren* v. *Missouri*, 439 U.S. 357, 364, 99 S. Ct. 664, 58 L. Ed. 2d 579 (1979), the court established "a prima facie violation of the fair-cross-section requirement, [where] the defendant [shows] (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." This court has recognized that the jury must be drawn from a fair cross section of the community. See, e.g., *State* v. *Webb*, 238 Conn. 389, 450–52, 680 A.2d 147 (1996); *State* v. *Robinson*, 227 Conn. 711, 717–18, 631 A.2d 288 (1993); *State* v. *Tillman*, 220 Conn. 487, 492, 600 A.2d 738 (1991), cert. denied, 505 U.S. 1207, 112 S. Ct. 3000, 120 L. Ed. 2d 876 (1992); *State* v. *McCarthy*, 197 Conn. 247, 250, 496 A.2d 513 (1985); *State* v. *Castonguay*, 194 Conn. 416, 421–22, 481 A.2d 56 (1984). While the United States Supreme Court has rejected the argument that death qualified jurors are a distinctive group whose exclusion violates the fair cross section requirement under *Lockhart* v. *McCree*, supra, 476 U.S. 162,[13] in my view we should reach the

---

[13] The United States Supreme Court, in *Lockhart*, addressed the issue of whether "death qualification or the removal for cause of the so-called *Witherspoon*-excludable prospective jurors" violated the fair cross section requirement. (Internal quotation marks omitted.) *Lockhart* v. *McCree*, supra, 476 U.S. 167. A *Witherspoon*-excludable is a prospective juror who would answer affirmatively that his "views [on the death penalty] would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath" and, as a result, who would be excluded from serving on the jury. (Internal quotation marks omitted.) Id., 167 n.1; *Wainwright* v. *Witt*, 469 U.S. 412, 420, 105 S. Ct. 844, 83 L. Ed. 2d 841 (1985);

conclusion that their exclusion does violate that requirement under a state constitutional analysis.

I am not alone in asking "whether an impartial jury can exist when a distinct group in the community is excluded by systematically challenging them for cause" from the jury selection process. *Grigsby* v. *Mabry*, 758 F.2d 226, 241–42 (8th Cir. 1985), rev'd sub nom. *Lockhart* v. *McCree*, 476 U.S. 162, 106 S. Ct. 1758, 90 L. Ed. 2d 137 (1986). In *Grigsby*, a decision eventually reversed in *Lockhart*,[14] the Eighth Circuit Court of

*Adams* v. *Texas*, 448 U.S. 38, 45, 100 S. Ct. 2521, 65 L. Ed. 2d 581 (1980); *Witherspoon* v. *Illinois*, supra, 391 U.S. 522–23 n.21. The *Lockhart* court held that "[t]he essence of a fair-cross-section claim is the systematic exclusion of a distinctive group in the community. *Duren* [v. *Missouri*, supra, 439 U.S. 364]. In our view, groups defined solely in terms of shared attitudes that would prevent or substantially impair members of the group from performing one of their duties as jurors, such as the *Witherspoon*-excludables at issue here, are not distinctive groups for fair-cross-section purposes." (Internal quotation marks omitted.) *Lockhart* v. *McCree*, supra, 174.

[14] The United States Supreme Court in *Lockhart* v. *McCree*, supra, 476 U.S. 173, held that the constitution does not prohibit the removal for cause, during the guilt phase, of prospective jurors whose opposition to the death penalty would prevent or substantially impair the performance of their duties as jurors. The court assumed, arguendo, that the social science studies introduced by the respondent; see footnotes 19 and 20 of this dissent for a discussion of those same studies; established that death qualified juries are "more conviction-prone than non-death-qualified juries." Id.

The *Lockhart* court held that death qualified juries do not violate the fair cross section requirement of the sixth amendment. Id., 177. The sixth amendment applies to jury panels or venires but does not require that petit juries actually reflect the composition of the community at large. Id., 173. Furthermore, the essence of a fair cross section claim is the systematic exclusion of a distinctive group in the community—such as African-Americans, women and Mexican-Americans—for reasons completely unrelated to their ability to serve as jurors in a particular case. Id., 175. Distinctive groups, in the view of the United States Supreme Court, do not include people whose attitudes would prevent or substantially impair the performance of their duties as jurors, such as the *Witherspoon*-excludables. Id., 174. Death qualification serves "the State's legitimate interest in obtaining a jury that can properly and impartially apply the law to the facts of the case at both the guilt and sentencing phases of a capital trial." Id., 175–76.

It is interesting to note that, although Arkansas law does not provide for a bifurcated trial, as pointed out by the United States Supreme Court in

Appeals addressed "whether the exclusion of jurors who hold absolute scruples against the death penalty creates a 'conviction prone' jury as to the guilt of a defendant in a capital case." *Grigsby* v. *Mabry*, supra, 228. The Eighth Circuit, in a compelling analysis, held "that substantial evidence supports the court's finding that a capital jury, with [*Witherspoon*-excludables][15] stricken for cause, is in fact conviction prone and, therefore, does not constitute a cross-sectional representation in a given community." Id., 229; see also *Keeten* v. *Garrison*, 578 F. Sup. 1164, 1181 (W.D.N.C.) ("persons who are unwilling to impose the death penalty share a unique set of attitudes toward the criminal justice system which separate them as a group not only from persons who favor the death penalty, but also from persons who are generally opposed to the death penalty, but [will] consider it in some cases"), rev'd, 742 F.2d 129 (4th Cir. 1984), cert. denied, 476 U.S. 1145, 106 S. Ct. 2258, 90 L. Ed. 2d 702 (1986).

### D

### Sociological Considerations

A distinctive group of death qualified jurors emerges from the examination of sociological studies. This evidence suggests that death qualified jurors are systematically excluded from the jury selection process in violation of the fair cross section requirement.

Under the first part of the *Duren* test,[16] death qualified jurors form a distinctive group in the community.[17] The

---

*Lockhart*, Connecticut law does authorize such bifurcation. See General Statutes § 53a-46a.

[15] See footnote 13 of this dissent for a discussion of *Witherspoon*-excludables.

[16] See part III C of this dissent.

[17] The Eighth Circuit has reasoned that according to "the specific elements of the *Duren* test, we find *Witherspoon* also is direct authority that the group of [*Witherspoon*-excludables] excluded in this case is a distinctive group in the community. *Witherspoon* found a distinctive group in those venirepersons who were not 'automatic-life' but still had scruples against the death penalty. The district court found 'that the [*Witherspoon*-exclud-

results of a national survey indicate that 22 percent of the population are against the death penalty for a person convicted of murder.[18] After the *Witherspoon* decision, researchers who sought to put a face on those who opposed the death penalty found that more African-Americans and women are excluded because of their opposition to the death penalty despite their ability to serve impartially during the guilt phase. See *Lockhart* v. *McCree*, supra, 476 U.S. 186–87 (Marshall, J., dissenting).

Beyond sheer numbers, researchers consistently find that the attitudes of death qualified jurors are distinguishable from those of other jurors. Attitudinal surveys that have sampled venirepersons, individuals who were eligible for jury service and members of the general population, consistently found that those who support the death penalty are more likely to hold prosecution perspectives.[19] They are "more likely to believe that a

able] group is of substantial size both nationally and within the state of Arkansas . . . . So the group excluded is both distinct and sizeable.' *Grigsby* [v. *Mabry*, 569 F. Sup. 1273, 1285 (E.D. Ark. 1983)]." *Grigsby* v. *Mabry*, supra, 758 F.2d 231.

[18] See M. Gillespie, Public Opinion Supports Death Penalty, Gallup News Service, February 24, 1999, p. 2.

[19] In *Grigsby* v. *Mabry*, supra, 758 F.2d 232–33, the court described the results of a number of "Attitudinal and Demographic Surveys" as follows:

"1. Bronson, 'On the Conviction Proneness and Representativeness of the Death-Qualified Jury: An Empirical Study of Colorado Veniremen,' 42 U. Colo. L. Rev. 1 (1970). (Bronson-Colorado).

"The subjects of this study were 718 Colorado venirepersons. Interviews were done by trained students from the University of Colorado in 1968 and 1969. Each subject was asked whether they strongly favored, favored, opposed, or strongly opposed the death penalty. This was followed by five questions regarding attitudes on criminal justice issues. On each of the five questions the survey found the stronger the subjects' support for the death penalty, the stronger their support for positions most favorable to the prosecution.

"2. Bronson, 'Does the Exclusion of Scrupled Jurors in Capital Cases Make the Jury More Likely to Convict? Some Evidence from California,' 3 Woodrow Wilson L.J. 11 (1980). (Bronson-California). . . .

"Trained students interviewed 755 Butte County, California, venirepersons regarding their position on the death penalty. Seven attitudinal questions, much like those used in Bronson-Colorado, followed. Once again a direct

defendant's failure to testify is indicative of his guilt, more hostile to the insanity defense, more mistrustful of defense attorneys, and less concerned about the danger of erroneous convictions. [*Grigsby* v. *Mabry*, 569 F. Sup. 1273, 1283, 1293, 1304 (E.D. Ark. 1983)]." *Lockhart* v. *McCree*, supra, 476 U.S. 188 (Marshall, J., dissenting). In addition, "[t]his proprosecution bias is reflected in the greater readiness of death-qualified jurors to convict or to convict on more serious charges. [*Grigsby* v. *Mabry*, supra, 569 F. Sup. 1294–1302]; *Grigsby* v. *Mabry*, [supra, 758 F.2d 233–36].[20] . . . [Even]

and significant correlation between death penalty beliefs and criminal justice attitudes was found.

"The second survey involved interviews of 707 venirepersons from Los Angeles, Sacramento and Stockton, California. The results were consistent with the prior studies: the more strongly the subjects favored the death penalty, the more likely they were to endorse pro-prosecution positions.

"3. Louis Harris & Associates, Inc., Study No. 2016 (1971).

"Harris randomly polled 2,068 adults throughout the United States in 1971. The respondents were asked about their attitudes on the death penalty and other criminal justice issues. The results parallel those of the Bronson surveys. In addition, Harris found more blacks than whites, and more women than men, would be excluded from jury service by death qualification.

"4. Fitzgerald & Ellsworth, 'Due Process vs. Crime Control: Death Qualification and Jury Attitudes,' 8 Law & Hum. Behav. 31 (1984). (Fitzgerald-1979).

"The survey upon which this article is based was a sample of 811 jury eligible persons in Alameda County, California, in 1979. An independent professional polling organization, Field Research Corporation of San Francisco, drew the sample and interviewed the subjects. Respondents who could not be fair and impartial, i.e., nullifiers, were excluded. Of the remaining 717 subjects, over seventeen percent were found to be [*Witherspoon*-excludables]. Questions regarding attitudes on criminal justice issues showed that death qualified respondents were more favorable to the prosecution than the [*Witherspoon*-excludables].

"5. Precision Research, Inc., Survey No. 1286 (1981). (Precision Survey).

"This survey was conducted by an Arkansas polling organization in 1981. A sample of 407 adults in the state of Arkansas were asked the same questions used in Fitzgerald-1979. The survey found that approximately eleven percent of those who could be fair and impartial in determining guilt-innocence were [*Witherspoon*-excludables]."

[20] The court in *Grigsby* v. *Mabry*, supra, 758 F.2d 233–34, noted the findings of several "Conviction-Proneness Surveys" as follows:

"1. H. Zeisel, Some Data on Juror Attitudes Toward Capital Punishment (University of Chicago Monograph 1968). (Zeisel).

the very process of death qualification—which focuses

"In 1954 and 1955 Zeisel questioned jurors who had served on felony juries in Brooklyn, New York, and Chicago, Illinois. The subjects were asked about the first ballot votes of their jury and whether they had scruples against the death penalty. The study controlled for the weight of evidence in each case and found jurors with conscientious scruples against the death penalty voted to acquit more often than jurors without such scruples.

"2. W. Wilson, Belief in Capital Punishment and Jury Performance (1964) (unpublished). (Wilson).

"This study presented 187 college students with written descriptions of five capital cases in 1964. Each student was asked whether he or she had scruples against the death penalty. They were then asked to assume that they were jurors in the five cases. The students without death penalty scruples voted for conviction more often than those with scruples.

"3. Goldberg, 'Toward Expansion of *Witherspoon*: Capital Scruples, Jury Bias, and Use of Psychological Data to Raise Presumptions in the Law,' 5 Harv. C.R.-C.L.L. Rev. 53 (1970).

"A set of sixteen written descriptions were given to 100 white and 100 black college students in Georgia. Those without scruples voted to convict in seventy-five percent of cases, compared to sixty-nine percent for those with scruples.

"4. Jurow, 'New Data on the Effect of a "Death Qualified" Jury on the Guilt Determination Process,' 84 Harv. L. Rev. 567 (1971). (Jurow).

"Audio recordings of two simulated murder trials were played for 211 employees of Sperry Rand Corporation in New York. The subjects filled out questionnaires which measured their attitudes toward the death penalty and various criminal justice issues. The subjects were then asked to listen to each 'trial' and vote on guilt-innocence. Those persons who more strongly favored the death penalty were found to be more likely to convict.

"5. Cowan, Thompson & Ellsworth, 'The Effects of Death Qualification on Jurors' Predisposition to Convict and on the Quality of Deliberation,' 8 Law & Hum. Behav. 53 (1984). (Cowan-Deliberation).

"This 1979 study began by identifying the [*Witherspoon*-excludables] in its sample of jury eligible residents of San Mateo and Santa Clara Counties, California. Those [*Witherspoon*-excludables] who could not be fair and impartial in determining guilt-innocence (nullifiers) were excluded from the sample. The remaining 288 subjects were shown a realistic two and one-half hour videotape of a murder trial. The subjects filled out questionnaires regarding their criminal justice attitudes and were assigned to panels of twelve in order to simulate jury deliberations. Some panels were death qualified, while others included [*Witherspoon*-excludables]. Ballot forms were filled out by each subject before and after the panel deliberations as a means of examining the quality and importance of the deliberations.

"The study found that death penalty attitudes were closely linked to conviction proneness—subjects favoring the death penalty were more likely to convict. In addition, the study concluded that jury panels containing a

attention on the death penalty before the trial has even begun—has been found to predispose the jurors that survive the process to believe that the defendant is guilty. [*Grigsby* v. *Mabry*, supra, 569 F. Sup. 1302–1305; *Grigsby* v. *Mabry*, supra, 758 F.2d 234]." *Lockhart* v. *McCree*, supra, 188 (Marshall, J., dissenting).

The majority's critique of the sociological evidence raises the question of whether any study would be satisfactory short of an admission by the jurors who sat on the case and who favored the death penalty that they have a bias for conviction. The majority maintains that their "own thorough examination . . . persuades [them] that the social science evidence presented in [*Grigsby* and *Keeten*, that is relied upon by the defendant] is not capable of establishing the defendant's hypothesis . . . that in Connecticut in 1999, the removal for cause, prior to the guilt phase of a capital felony trial, of venirepersons whose beliefs concerning the death penalty would prevent or substantially impair the performance of their duties as jurors during the sentencing phase of a capital felony trial results in a more 'conviction prone' jury." My simple answer to the majority's conclusion is that, putting the studies aside, anyone with any common sense and who has the experience of life, would be compelled to come to the conclusion that venirepersons who favor the death penalty are more conviction prone than those who oppose it.

Furthermore, their criticism unfairly minimizes the value of those sociological studies examining the relationship between attitudes and human behavior. The majority argues that in five of the studies, researchers did not identify participants who would be death qualified. While this is true, the subjects of these studies

mix of [*Witherspoon*-excludables] and death-qualified subjects tended to view all witnesses more critically and remember the facts of the case more accurately than death-qualified jury panels."

were either jurors or members of the general population who are potentially members of the jury pool. The majority also criticizes the remaining studies that correlate subjects' attitudes toward the death penalty with attitudes toward the criminal justice system but do not assess whether they would be more likely to vote for conviction. This criticism ignores the finding that the beliefs of those subjects are internally consistent; if subjects support the death penalty, they are more likely to hold proprosecution beliefs. A reasonable inference from these studies is that jurors with these beliefs are more likely to convict.

The majority fails to recognize the "essential unanimity of the results obtained by researchers using diverse subjects and varied methodologies." *Lockhart* v. *McCree*, supra, 476 U.S. 189 (Marshall, J., dissenting). They would have us put common sense aside and a defendant's life on hold while we wait for the definitive sociological study of whether jurors who hold positive attitudes toward the death penalty are more likely to favor the prosecution and thus, vote to convict. "The evidence thus confirms, and is itself corroborated by, the more intuitive judgments of scholars and of so many of the participants in capital trials—judges, defense attorneys, and prosecutors. [See *Grigsby* v. *Mabry*, supra, 569 F. Sup. 1322]." *Lockhart* v. *McCree*, supra, 188 (Marshall, J., dissenting).

Turning to the second prong of the *Duren* test,[21] it is not fair and reasonable to allow our trial courts to

---

[21] The Eighth Circuit, in *Grigsby* v. *Mabry*, supra, 758 F.2d 231–32, considered that "[t]he second element of the *Duren* test relates to venires. However, given our earlier discussion and finding that there is no practical difference between exclusion from the venire and systematic exclusion for cause from the petit jury, we analyze the resultant petit juries. In this case we find the representation of [*Witherspoon*-excludables] on the juries is not 'fair and reasonable in relation to the number of such persons in the community . . . .' *Duren* [v. *Missouri*, supra, 439 U.S. 364]. The district court found [*Witherspoon*-excludables] constitute between eleven and seventeen percent of the population. However, [*Witherspoon*-excludables] are totally excluded from guilt-innocence juries in Arkansas."

exclude death qualified jurors from the jury pool given the significant number of persons who oppose the death penalty. In addition, by allowing prosecutors to eliminate these jurors there has been an expansion of the number of potential jurors who are excluded through peremptory challenges and those that are eliminated for cause.[22] See *Lockhart* v. *McCree,* supra, 476 U.S. 190–92 (Marshall, J., dissenting).

[22] "The true impact of death qualification on the fairness of a trial is likely even more devastating than the studies show. *Witherspoon* placed limits on the State's ability to strike scrupled jurors for cause, unless they state 'unambiguously that [they] would automatically vote against the imposition of capital punishment no matter what the trial might reveal,' [*Witherspoon* v. *Illinois,* supra, 391 U.S. 516 n.9]. It said nothing, however, about the prosecution's use of peremptory challenges to eliminate jurors who do not meet that standard and would otherwise survive death qualification. See Gillers, 'Deciding Who Dies,' 129 U. Pa. L. Rev. 1, 85 n.391 (1980). There is no question that peremptories have indeed been used to this end, thereby expanding the class of scrupled jurors excluded as a result of the death-qualifying voir dire challenged here. See, e.g., *People* v. *Velasquez,* 26 Cal. 3d 425 [438 n.9, 606 P.2d 341, 162 Cal. Rptr. 306] (1980) (prosecutor informed court during voir dire that if a venireperson expressing scruples about the death penalty 'were not a challenge for cause, I would kick her off on a peremptory challenge'). The only study of this practice has concluded: 'For the five-year period studied a prima facie case has been demonstrated that prosecutors in Florida's Fourth Judicial Circuit systematically used their peremptory challenges to eliminate from capital juries venirepersons expressing opposition to the death penalty.' Winick, 'Prosecutorial Peremptory Challenge Practices in Capital Cases: An Empirical Study and a Constitutional Analysis,' 81 Mich. L. Rev. 1, 39 (1982).

"Judicial applications of the *Witherspoon* standard have also expanded the class of jurors excludable for cause. While the studies produced by respondent generally classified a subject as a *Witherspoon*-excludable only upon his unambiguous refusal to vote death under any circumstance, the courts have never been so fastidious. Trial and appellate courts have frequently excluded jurors even in the absence of unambiguous expressions of their absolute opposition to capital punishment. Schnapper, 'Taking *Witherspoon* Seriously: The Search for Death-Qualified Jurors,' 62 Texas L. Rev. 977, 993–1032 (1984). And this less demanding approach will surely become more common in the wake of this Court's decision in *Wainwright* v. *Witt,* 469 U.S. 412 [105 S. Ct. 844, 83 L. Ed. 2d 841] (1985). Under *Witt,* a juror who does not make his attitude toward capital punishment 'unmistakably clear,' *Witherspoon* [v. *Illinois,* supra, 391 U.S. 522 n.21], may nonetheless be excluded for cause if the trial court is left with the impression that his attitude will ' "prevent or substantially impair the performance of his duties

Finally, the state of course does not deny that the third prong of the *Duren* test has been satisfied—that is, these venirepersons that are death qualified are systematically excluded for cause.[23]

Under the *Duren* test, once the defendant has established a prima facie case, the burden then shifts to the state to prove that the selection system resulting in a nonrepresentative array furthers a significant state interest. *Duren* v. *Missouri*, supra, 439 U.S. 368. The majority claims that "[t]he state has a valid and important interest in having the same jury serve at the guilt and penalty phases of a capital felony trial. . . . In most capital cases, the evidence presented to demonstrate the defendant's guilt also will be relevant to the determination of the existence of aggravating factors. . . . Thus, if different juries were required to consider the guilt and penalty issues, much of the same evidence would be likely to be presented to each of the juries." (Citation omitted; internal quotation marks omitted.) The majority indicates that the state's interest in judicial efficiency, that is, not presenting the same evidence to two different juries, is more important than the defendant's right to an impartial jury. Clearly, the state has not satisfied their burden of proving a significant interest.

---

as a juror in accordance with his instructions and his oath." ' [*Wainwright* v.] *Witt*, supra, [433] (quoting *Adams* v. *Texas*, 448 U.S. 38, 45 [100 S. Ct. 2521, 65 L. Ed. 2d 581] [1980]). It thus 'seems likely that *Witt* will lead to more conviction-prone panels' since ' "scrupled" jurors—those who generally oppose the death penalty but do not express an unequivocal refusal to impose it—usually share the pro-defendant perspective of excludable jurors.' See Finch & Ferraro, 'The Empirical Challenge to Death Qualified Juries: On Further Examination,' 65 Neb. L. Rev. 21, 63 (1986)." *Lockhart* v. *McCree*, supra, 476 U.S. 190–92 (Marshall, J., dissenting).

[23] The Eighth Circuit, in *Grigsby* v. *Mabry*, supra, 758 F.2d 232, considered that "*Duren* requires the petitioners to establish that the [*Witherspoon*-excludables] are systematically excluded. Here, the district court found the systematic exclusion results from the voir dire at trial. *Grigsby* [v. *Mabry*, supra, 569 F. Sup. 1286]. There is little argument offered by the state that in capital cases the exclusion is not systematic."

Although I realize that Justice Borden, who votes with the majority in the present case, dissented in *State* v. *Jones*, supra, 234 Conn. 359, I thought we had indicated in *Jones* that when we must choose between justice and judicial efficiency, we come down strongly on the side of justice. To reiterate a point set forth by the majority in *Jones*, the "[c]onservation of judicial resources is insufficient justification to deny the defendant's request to bifurcate the trial where having the jury determine the truth of the prior murder conviction allegation concurrently with the currently charged murder poses a risk of substantial prejudice to the defendant." Id., 346.

## E

### Sibling Approach

Although our sister states who authorize the penalty of death consistently have held that the death qualification of a jury passes constitutional muster, the concurring and dissenting opinions in *State* v. *Ramseur*, 106 N.J. 123, 524 A.2d 188 (1987), are compelling. Justice O'Hern, in his concurrence, pointed out the following: "I need not even dwell on the question of whether death-qualified juries are conviction-prone juries. The point is that a jury selection process that systematically excludes all jurors who cannot state a commitment to the death penalty results in a jury that . . . is not a truly representative cross-section of the community and deprives the capital defendant of a jury of his peers on the fundamental question of guilt or innocence." Id., 337. And Justice Handler, in his dissent in *Ramseur*, reasoned that death qualification violated New Jersey's "constitutional guarantees of a fair and impartial jury as a matter of fundamental fairness." Id., 435. Justice Handler went on to state: "I agree with Justice O'Hern in his concurring opinion . . . that the inconvenience entailed in providing for a non death-qualified jury—

one that is fair and impartial—in the trial of guilt is not too high a price to pay to vindicate [the] defendant's constitutional interests. There can be no question that the use of completely separate juries would solve the problem because guilt would be determined by a normally composed jury but penalty would be determined by a death-qualified jury. A prohibition of death-qualifying the jury for the guilt phase of capital trials would impose relatively insubstantial burdens on the state." (Citation omitted.) Id., 434 (Handler, J., dissenting).

The California Supreme Court likewise recognized the constitutional problem of death qualification: "Jurors undergoing death-qualification would have reason to infer that the judge and the attorneys personally believe the accused to be guilty or expect the jury to come to that conclusion. Only such an inference could serve to explain to the jurors why so much time and energy are devoted to an extensive discussion of penalty before trial. Provided with these cues from people who are not only experts in the courtroom but are also presumably acquainted with all the evidence in the case, the relevant law, and the 'correct' application of the one to the other, death-qualified jurors may themselves become more inclined to believe that the accused is guilty as charged." *Hovey* v. *Superior Court*, 28 Cal. 3d 1, 71, 616 P.2d 1301, 168 Cal. Rptr. 128 (1980).

F

Historical Approach

In examining the intent of the framers of the state constitution, it is evident that the right to a trial by an impartial jury was a core principle in the development of our state constitution. Its inclusion reflects a profound understanding of how the state's power to prosecute is tempered by the rights of the criminal defendant. William Blackstone, writing in the 18th century, observed that "the founders of the English law have,

with excellent forecast, contrived that . . . the truth of every accusation, whether preferred in the shape of indictment, information, or appeal, should afterwards be confirmed by the unanimous suffrage of twelve of his equals and neighbours, *indifferently chosen* and superior to all suspicion." (Emphasis added; internal quotation marks omitted.) *Duncan* v. *Louisiana*, 391 U.S. 145, 151–52, 88 S. Ct. 1444, 20 L. Ed. 2d 491 (1968). Our founding fathers included in the Bill of Rights, later incorporated into the constitution by the sixth amendment to the United States constitution, that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . . ." Soon after, every state, including Connecticut in its first formal constitution of 1818, mandated that the criminal defendant had the right to a trial by an impartial jury. See Conn. Const., art. I, §§ 8, 19.

"Those who wrote our constitutions knew from history and experience that it was necessary to protect against unfounded criminal charges brought to eliminate enemies and against judges too responsive to the voice of higher authority. The framers of the constitutions strove to create an independent judiciary but insisted upon further protection against arbitrary action. Providing an accused with the right to be tried by a jury of his peers gave him an inestimable safeguard against the corrupt or overzealous prosecutor and against the compliant, biased, or eccentric judge . . . . [T]he jury trial provisions in the Federal and State Constitutions reflect a fundamental decision about the exercise of official power—a reluctance to entrust plenary powers over the life and liberty of the citizen to one judge or to a group of judges. Fear of unchecked power, so typical of our State and Federal Governments in other respects, found expression in the criminal law in this insistence upon community participation in the

determination of guilt or innocence." *Duncan* v. *Louisiana*, supra, 391 U.S. 156.

It is against this historical background that the state constitution needs to be viewed. The right to trial by an impartial jury was incorporated into the state's first formal constitution in 1818. More recently, this court has reiterated that "[j]ury impartiality is a core requirement of the right to trial by jury guaranteed by the constitution of Connecticut, article first, § 8, and by the sixth amendment to the United States constitution. . . . [T]he right to a jury trial guarantees to the criminally accused a fair trial by a panel of impartial, indifferent jurors." (Internal quotation marks omitted.) *State* v. *Rhodes*, 248 Conn. 39, 46, 726 A.2d 513 (1999). When a jury is selected from a pool that is conviction prone, it baffles me how anyone could determine such a potential juror could possibly be impartial.

G

Conclusion of Discussion of *Geisler* Factors

In short, the death qualification of a jury that determines the guilt or innocence of the criminal defendant in a capital trial cannot pass state constitutional muster. Even if the costs of having separate juries to determine guilt and the penalty could be considered, they are insignificant. I thought it was "settled that a State may not entrust the determination of whether a man is innocent or guilty to a tribunal 'organized to convict.' *Fay* v. *New York*, 332 U.S. 261, 294 [67 S. Ct. 1613, 91 L. Ed. 2043 (1947)]. See *Tumey* v. *Ohio*, 273 U.S. 510 [47 S. Ct. 437, 71 L. Ed. 749 (1927)]. It requires but a short step from that principle to hold, as we do today, that a State may not entrust the determination of whether a man should live or die to a tribunal organized to return a verdict of death." *Witherspoon* v. *Illinois*, supra, 391 U.S. 521.

## IV

Although I do not believe that the death penalty can be constitutionally imposed under our state constitution, common decency should dictate that, at the very least, when this extreme and barbaric punishment is sought by the state, we level the playing field so the defendant can at least receive a fair trial in the determination of his guilt or innocence. Today, the majority compounds the brutality of the penalty of death by ensuring that a jury is death qualified and, therefore, more likely to convict the defendant at the guilt phase of the trial. In order to gain this tactical advantage, the state will from this day forward be encouraged to seek death in those marginal cases in which such a penalty should not have been sought.

This probably will be the last case before my retirement in which I will have the opportunity to express my views with respect to the dreadful punishment of death and related matters. Civilized nations have barred this horrible punishment. Some of our sister states have also banned death as a punishment, including all of the New England states except one—Connecticut. I have pointed out in my dissents in *State* v. *Cobb*, 251 Conn. 285, 523, 743 A.2d 1 (1999), *State* v. *Webb*, 238 Conn. 389, 552–54, 680 A.2d 147 (1996), *State* v. *Breton*, 235 Conn. 206, 262, 663 A.2d 1026 (1995), and *State* v. *Ross*, 230 Conn. 183, 294, 646 A.2d 1318 (1994), cert. denied, 513 U.S. 1165, 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995), that the penalty of death fails to comport with contemporary standards of decency and that it constitutes cruel and unusual punishment in violation of our state constitution. I leave this court heartbroken because, as a result of one vote,[24] Connecticut is not among those enlightened states and nations to put an end to the

---

[24] See *State* v. *Cobb*, supra, 251 Conn. 285 (four to three decision); *State* v. *Webb*, supra, 238 Conn. 389 (four to three decision).

death penalty. But those who would have it must live with this stain of blood. The determination of the constitutionality of the death penalty is not in the control of the legislature but, rather, in this court and the majority has failed to recognize its unconstitutionality.

I dissent.

NORCOTT, J., with whom KATZ, J., joins, dissenting. I respectfully dissent from the conclusion of the majority that the practice of "death qualification," that is, the exclusion from capital juries of an entire group of potential jurors who express beliefs in opposition to the death penalty during voir dire questioning, does not violate the state constitution. While it is clear that this question has been resolved against the defendant's claim under the federal constitution; *Lockhart* v. *McCree*, 476 U.S. 162, 165, 106 S. Ct. 1758, 90 L. Ed. 2d 137 (1986); I hold to the belief that the majority opinion's analysis of the practice does not stand up under our state constitution.[1]

In essence, I agree with the defendant's analysis of the state constitutional issue under the criteria set forth in *State* v. *Geisler*, 222 Conn. 672, 684–86, 610 A.2d 1225 (1992). The defendant's conclusion that the Connecticut constitution should provide greater due process protection to criminal defendants than the federal constitution on the death qualification exclusion of jurors is compelling. It is axiomatic that "[s]tates are free to provide greater protections in their criminal justice system than the Federal Constitution requires." *California* v. *Ramos*, 463 U.S. 992, 1014, 103 S. Ct. 3446, 77 L. Ed.

---

[1] It is noteworthy that prior to *McCree*, several jurists in the lower federal courts provided sound, cogent dissenting opinions suggesting that the conclusion that the United States Supreme Court ultimately chose to adopt was undermined by a wealth of empirical evidence, which, for the most part, is relied upon by the defendant in the present case. Of course, it is a part of the historical record that in *Lockhart* v. *McCree*, supra, 476 U.S. 184, Justice Marshall provided what is clearly the most compelling overall dissenting opinion in opposition to the practice of "death qualification" of jurors.

2d 1171 (1983). Indeed, this court has concluded in a number of criminal cases that our state constitution provides broader protections of individual rights than does its federal counterpart. See *State* v. *Wilkins*, 240 Conn. 489, 505, 692 A.2d 1233 (1997); *State* v. *DeFusco*, 224 Conn. 627, 632, 620 A.2d 746 (1993); *State* v. *Oquendo*, 223 Conn. 635, 649, 613 A.2d 1300 (1992); *State* v. *Marsala*, 216 Conn. 150, 160, 579 A.2d 58 (1990). While the majority provides a rather tight analysis of the defendant's state constitutional claim under most of the *Geisler* factors, it seems to me that the majority concludes too hastily under the "economic and sociological" factors, discussed in part I F of its opinion, that the empirical studies that suggest that death qualification produces a jury that is more prone to convict at the guilt phase and that, accordingly, a defendant's constitutional right to a fair trial is thereby impaired should be rejected under a state constitutional analysis.

At the outset, I must say that I simply cannot overcome my intuitive agreement with the claim that death qualified juries are disposed to convict at the guilt phase. In my opinion, the empirical support for this claim, first set forth in *McCree* and supplemented by the defendant in this appeal,[2] merits far more consideration

[2] In *Keeten* v. *Garrison*, 578 F. Sup. 1164, 1171–1177 (W.D.N.C.), rev'd, 742 F.2d 129 (4th Cir. 1984), cert. denied, 476 U.S. 1145, 106 S. Ct. 2258, 90 L. Ed. 2d 702 (1986), and *Grigsby* v. *Mabry*, 569 F. Sup. 1273, 1295–1305 (E.D. Ark. 1983), aff'd, 758 F.2d 226 (8th Cir. 1985), rev'd sub nom. *Lockhart* v. *McCree*, supra, 476 U.S. 162, the courts discussed the results of numerous sociological studies that have evaluated the ramifications of death qualification of juries. Beyond a showing that these juries are more prosecution prone, "some two dozen studies suggest that jurors who withstand death qualification tend to be significantly less solicitous of a defendant's due process rights and significantly more eager to convict." *State* v. *Young*, 853 P.2d 327, 389 (Utah 1993) (Durham, J., dissenting). The defendant refers to the following studies, which were considered by these courts: (1) the Ellsworth Attitude Survey, reported in R. Fitzgerald & P. Ellsworth, "Due Process vs. Crime Control: Death Qualification and Jury Attitudes," 8 Law & Hum. Behav. 31 (1984); (2) the Bronson-Colorado Study, reported in E. Bronson, "On the Conviction Proneness and Representativeness of the Death-Qualified Jury: An Empirical Study of Colorado Veniremen," 42 U. Colo. L. Rev.

than that given by the majority. Early on, Justice Marshall dutifully observed that "[t]he chief strength of [these studies] lies in the essential unanimity of the results obtained by researchers using diverse subjects and varied methodologies." *Lockhart* v. *McCree*, supra, 476 U.S. 189. Justice Marshall further noted in his dissent that "[t]he data strongly suggest that death qualification excludes a significantly large subset—at least 11 [percent] to 17 [percent]—of potential jurors who could be impartial during the guilt phase of the trial. Among members of this excludable class are a disproportionate number of blacks and women. . . .

1 (1970); (3) the Bronson-California Study, reported in E. Bronson, "Does the Exclusion of Scrupled Jurors in Capital Cases Make the Jury More Likely to Convict? Some Evidence from California," 3 Woodrow Wilson J.L. 11 (1980); (4) the Harris 1971 Study, L. Harris & Associates, Inc., "Study No. 2016" (1971), reported in part in W. White, "The Constitutional Invalidity of Convictions, Imposed by Death-Qualified Juries," 58 Cornell L. Rev. 1176 (1973); (5) the Zeisel Study, by H. Zeisel, "Some Data on Juror Attitudes Toward Capital Punishment," University of Chicago Law School: Center for Studies in Criminal Justice (1968); (6) the Wilson Study, by W. Wilson, "Belief in Capital Punishment and Jury Performance," University of Texas (1964) (unpublished); (7) the Goldberg Study, reported in F. Goldberg, "Toward Expansion of Witherspoon: Capital Scruples, Jury Bias, and the Use of Psychological Data to Raise Presumptions in the Law," 5 Harv. C.R.-C.L. L. Rev. 53 (1970); (8) the Jurow Study, reported in G. Jurow, "New Data on the Effect of a 'Death Qualified' Jury on the Guilt Determination Process," 84 Harv. L. Rev. 567 (1971); (9) the Ellsworth Conviction Proneness Study, reported in C. Cowan, W. Thompson & P. Ellsworth, "The Effects of Death Qualification on Jurors' Predisposition to Convict and on the Quality of Deliberation," 8 Law & Hum. Behav. 53 (1984); (10) the Ellsworth Witness Credibility Study, by P. Ellsworth, J. Harrington, W. Thompson & C. Cowan, "The Effect of Capital Punishment Attitudes on Juror Perceptions of Witness Credibility" (1979) (unpublished); (11) the Haney Study, reported in C. Haney, "On the Selection of Capital Juries: The Biasing Effects of the Death-Qualification Process," 8 Law & Hum. Behav. 121 (1984); and (12) the Harris 1981 Study, L. Harris & Associates, Inc., "Study No. 814002" (1981). Other related studies also are relevant. See W. Thompson, C. Cowan, P. Ellsworth & J. Harrington, "Death Penalty Attitudes and Conviction Proneness: The Translation of Attitudes into Verdicts," 8 Law & Hum. Behav. 95 (1984); P. Ellsworth, R. Bukaty, C. Cowan & W. Thompson, "The Death-Qualified Jury and the Defense of Insanity," 8 Law & Hum. Behav. 81 (1984).

"The perspectives on the criminal justice system of jurors who survive death qualification are systematically different from those of the excluded jurors. Death-qualified jurors are, for example, more likely to believe that a defendant's failure to testify is indicative of his guilt, more hostile to the insanity defense, more mistrustful of defense attorneys, and less concerned about the danger of erroneous convictions. . . . This pro-prosecution bias is reflected in the greater readiness of death-qualified jurors to convict or to convict on more serious charges. . . . And, finally, the very process of death qualification—which focuses attention on the death penalty before the trial has even begun—has been found to predispose the jurors that survive it to believe that the defendant is guilty." (Citations omitted.) Id., 187–88.

As one commentary observed, "[f]rom a social scientist's viewpoint the empirical question [whether death qualified juries are biased against the defendant on the issue of guilt] has been conclusively answered." R. Seltzer, G. Lopes, M. Dayan & R. Canan, "The Effect of Death Qualification on the Propensity of Jurors to Convict: The Maryland Example," 29 How. L.J. 571, 581 (1986). It seems to me that the cost of ignoring the direction in which the empirical data leads us is too great. While I do not believe that a minute dissection of these studies is warranted in this dissent, I do contend that the empirical evidence raises serious questions about the practice of the death qualification of juries. A succinct summarization of these studies reflects the following: (1) jurors who withstand death qualification tend to be less solicitous of a defendant's due process rights and significantly more eager to convict; see *State* v. *Young*, 853 P.2d 327, 389 (Utah 1993) (Durham, J., dissenting); (2) death qualification disproportionately excludes blacks and women, groups who statistically have been shown to be more opposed to the death

penalty than whites and men; see W. White, "The Constitutional Invalidity of Convictions Imposed by Death-Qualified Juries," 58 Cornell L. Rev. 1176, 1187 (1973); (3) jury deliberations do not "neutralize the voting propensities of individual death-qualified or excludable jurors"; *Grigsby* v. *Mabry*, 569 F. Sup. 1273, 1302 (E.D. Ark. 1983), aff'd, 758 F.2d 226 (8th Cir. 1985), rev'd sub nom. *Lockhart* v. *McCree*, supra, 476 U.S. 162; (4) jury panels that included *Witherspoon* excludables[3] were able to remember facts more accurately than their death qualified counterparts; id., 1302; (5) death qualified jurors, as opposed to "*Witherspoon* excludables," were more prone to believe prosecution than defense witnesses; see *Hovey* v. *Superior Court*, 28 Cal. 3d 1, 59–60, 616 P.2d 1301, 168 Cal. Rptr. 128 (1980); and (6) death qualified jurors maintained a higher standard of the concept of reasonable doubt than did jurors who were not death qualified; id., 59; see also W. White, supra, 58 Cornell L. Rev. 1188.

I am of the further opinion that the concerns of the state in opposition to alternatives to death qualification do not overcome my belief that the practice violates our state constitutional guarantees of a fair trial.[4]

While I am cognizant of the state's interest in the protection of "neutrality" on the penalty issue, and while I further acknowledge that the concerns about cost, time and judicial resources are valid ones, I do

---

[3] "*Witherspoon* excludables" identifies those jurors who are excluded because of their untenable opposition to the death penalty. See *Witherspoon* v. *Illinois*, 391 U.S. 510, 522, 88 S. Ct. 1770, 20 L. Ed. 2d 776 (1968) (death sentence could not be carried out if jury that recommended sentence was selected by excluding those who voiced general objection to death penalty).

[4] It is noteworthy that other state jurists have arrived at the same conclusion while dissenting from the decision of the majority of their courts that death qualification at the guilt stage does not violate their respective state constitutions. See *State* v. *Young*, supra, 853 P.2d 389 (Durham, J., dissenting); *State* v. *Ramseur*, 106 N.J. 123, 435, 524 A.2d 188 (1987) (Handler, J., dissenting).

not believe that, given the stakes involved, these concerns are compelling enough to change my position. Indeed, the idea that separate juries decide the issues of guilt and punishment as suggested by one commentator seems most prudent. See B. Winick, "Prosecutorial Peremptory Challenge Practices in Capital Cases: An Empirical Study and a Constitutional Analysis," 81 Mich. L. Rev. 1, 55–62 (1982). If the concern for assuring fairness in capital cases is to be taken seriously, surely implementing such an additional measure makes sense. Given the extraordinary delay that exists from the date of conviction to the date of actual execution of sentence in death penalty cases around the country, the concern about the excessive time factor involved in impaneling two juries is minimal.

Finally, I propose that even if the defendant's argument regarding the state constitution falls short, this court should consider the invocation of our supervisory powers and eliminate the practice of death qualification of juries. Connecticut has long held to a sense of fairness and justice when the question involves our criminal justice system. In the past we have taken steps to ensure attainment of these noble goals by the use of our supervisory powers. See *State* v. *Santiago*, 245 Conn. 301, 336, 715 A.2d 1 (1998) (requiring trial court to conduct preliminary inquiry when presented with allegation of ethic bias on part of jury); *State* v. *Coleman*, 242 Conn. 523, 542, 700 A.2d 14 (1997) (requiring judicial explanation as to reasons for imposing greater sentence after trial than sentence previously imposed under plea agreement); *State* v. *Gould*, 241 Conn. 1, 15, 695 A.2d 1022 (1997) (requiring playing of videotaped deposition in open court); *State* v. *Breton*, 235 Conn. 206, 250, 663 A.2d 1026 (1995) (special verdict form in capital case must include statement of jury's duties in determining defendant's capital penalty); *State* v. *Jones*, 234 Conn. 324, 346–47, 662 A.2d 1199 (1995) (requiring bifurcation

in certain death penalty cases); *State* v. *Patterson*, 230 Conn. 385, 397–400, 645 A.2d 535 (1994) (requiring presence of trial judge during voir dire in criminal case), on appeal after remand, 236 Conn. 561, 674 A.2d 416 (1996). As we noted in *State* v. *Jones*, supra, 346, "[c]onservation of judicial resources is insufficient justification to deny the defendant's request to bifurcate the trial where . . . [the circumstances pose] a risk of substantial prejudice to the defendant." I see no impediment likewise to employ our supervisory powers in the present case.

Accordingly, I dissent.